IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| AA METALS, INC.,<br><br>           *Plaintiff,*<br><br>  v.<br><br>UNITED STATES,<br><br>           *Defendant,*<br><br>  and<br><br>TEXARKANA ALUMINUM, INC.,<br><br>           *Defendant-Intervenor.* | Court No. 22-00051<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Business Proprietary Information Removed from Pages 8, 12, 13, 18, 21, 23-28, 32, and 37** |

**<u>PLAINTIFF AA METALS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>**

<div style="margin-left: 40%;">

Kristen Smith
Sarah E. Yuskaitis
**Sandler Travis & Rosenberg, P.A.**
1300 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20004
Tel: (202) 730-4965
Fax: (202) 842-2247

*Counsel to AA Metals, Inc.*

</div>

Dated: July 22, 2022

## TABLE OF CONTENTS

I.   RULE 56.2 STATEMENT ................................................................................. 1

   A.   THE ADMINISTRATIVE DETERMINATION UNDER REVIEW ................................ 1

   B.   ISSUES OF LAW PRESENTED ................................................................. 1

II.   STATEMENT OF FACTS ................................................................... 2

III.   SUMMARY OF ARGUMENT ................................................................ 11

IV.   ARGUMENT ................................................................................. 13

   A.   STANDARD OF REVIEW .................................................................... 13

   C.   LEGAL FRAMEWORK FOR SCOPE DETERMINATIONS ......................................... 15

   D.   COMMERCE FAILED TO ALLOW AA METALS TO ADDRESS AND CORRECT THE RECORD IN LIGHT OF COMMERCE'S DEEMED DEFICIENCY CONCERNING SCENARIO 2 PRODUCT ............................................................. 17

   E.   COMMERCE'S PLAIN LANGUAGE ANALYSIS OF THE *CHINA CAAS ORDERS* SCOPE LANGUAGE IS UNREASONABLE, ARBITRARY, AND NOT SUPPORTED BY LAW ................................................................................. 21

      1.   Commerce's Decision Unlawfully Expands the *China CAAS Orders* ............................ 23

      2.   Commerce was Required to Address 19 C.F.R. § 351.225(k)(1) ................................ 25

   F.   COMMERCE EXPANDED THE SCOPE OF THE *CHINA CAAS ORDERS* TO INCLUDE MERCHANDISE NOT CONSIDERED DURING THE UNDERLYING INVESTIGATION BY THE COMMISSION ................................................. 28

   G.   COMMERCE'S RELIANCE ON A SEPARATE AND DISTINCT ORDER UNLAWFULLY EXPANDED THE SCOPE OF THE *CHINA CAAS ORDERS* .................... 31

   H.   COMMERCE'S FAILURE TO ADDRESS THE SUBSTANTIAL TRANSFORMATION OF SCENARIO 2 IN TURKEY WAS UNLAWFUL ............................................. 32

V.   CONCLUSION ................................................................................. 37

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.L. Patterson, Inc. v. United States*, Court No. 11-00192 (Ct. Int'l Trade May 22, 2013) (ECF No. 56)..................................................................................................................................... 29
*Agilent Technologies v. United States*, 256 F. Supp. 3d 1338 (2017) ......................................... 36
*Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) .... 15, 28
*Alsthom Atlantique, et al. v. United States*, 787 F.2d 565 (Fed. Cir. 1986).................................. 21
*Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ............... 16, 25
*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ........................................... 14
*Cablesa S.A. de C.V. v. United States*, 31 C.I.T. 252 (2007)........................................................ 17
*Canadian Wheat Bd. v. United States*, 641 F. 3d 1344 (Fed. Cir. 2011) ..................................... 14
*Consol. Edison Co. of New York. v. NLRB*, 305 U.S. 197 (1938) ................................................ 14
*Diversified Products Corp. v. United States*, 572 F. Supp. 883 (Ct. Int'l Trade 1983).............. 28
*Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068 (Fed. Cir. 2001) ............................... 21, 25
*Ericsson GE Mobile Commc'ns v. United States*, 60 F.3d 778 (Fed. Cir. 1995)......................... 15
*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010)...................... 14
*King Supply Co., LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012).................................... 21
*Maquilacero S.A. de C.V. v. United States*, 256 F. Supp. 3d 1294 (Ct. Int'l Trade 2017) .......... 29
*Matsushita Elc. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984).............................. 14
*Meridian Prods., LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017)............................... 15, 22
*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)................ 14
*N. Polites v. United States*, 755 F. Supp. 2d 1352 (Ct. Int'l Trade 2011) ................................... 15
*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)......................................... 14
*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) .............................................. 14
TMB 44AOE, Inc v. United States, 399 F.Supp.3d 1314 (Ct. Int'l Trade 2019) ................... 22, 23
*Ugine & Alz Belg. V. United States*, 551 F.3d 1339 (Fed. Cir. 2009). ....................................... 34
*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................ 14
*WelCom Products, Inc v. United States*, 37 C.I.T. 570 (Apr. 24, 2013)...................................... 30
*WelCom Products, Inc. v. United States*, 865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012)......... 29, 30
*Wheatland Tube v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ........................................ 29, 30

**Statutes and Regulations**

19 C.F.R. § 165.16................................................................................................................... 6
19 C.F.R. § 351.225 ................................................................................................................. 2
19 C.F.R. § 351.225(d) ........................................................................................................... 28
19 C.F.R. § 351.225(k) ..................................................................................................... 15, 16
19 C.F.R. § 351.225(k)(1)................................................................................................. passim
19 C.F.R. § 351.225(k)(2)................................................................................................. 10, 28
19 C.F.R. § 351.303(g) ........................................................................................................... 20
19 C.F.R. § 351.303(g)(1)....................................................................................................... 20
19 C.F.R. § 351.303(g)(2)....................................................................................................... 20

19 C.F.R. 351.225(k) ......................................................................................... 23
19 U.S.C. § 1516a(b)(1)(B)(i).............................................................................. 13
19 U.S.C. § 1671 ................................................................................................ 28
19 U.S.C. § 1673 ................................................................................................ 28
28 U.S.C. § 1581(c) ............................................................................................. 1
*A.L. Patterson, Inc. v. United States,* 585 Fed. Appx. 778 (Fed. Cir. 2014) ............. 16, 22, 28, 29
*United Steel & Fasteners, Inc. v. United States*, 203 F. Supp. 3d 1235 (Ct. Int'l Trade 2017).... 16

**Other Authorities**

*Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Sept. 20, 2021) ...................................................... 15

**Administrative Decisions**

*Antidumping Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Affirmative Final Determination of Sales at Less-Than-Fair Value*, 83 Fed. Reg. 57,421, 2018 WL 5980596 (Nov. 15, 2018) ................................................................. 4
*Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22139 (Apr. 27, 2021)............. 31
*Common Alloy Aluminum Sheet from Bahrain, India, and the Republic of Turkey: Countervailing Duty Orders*, 86 Fed. Reg. 22,144 (Apr. 27, 2021) ................................................. 31
*Common Alloy Aluminum Sheet from China*, Inv. Nos. 701-TA-591 and 731-TA-1399 (Final), USITC Pub. 4861, 2019 WL 494837 (Jan. 2019)....................................................... 3, 4, 30, 31
*Common Alloy Aluminum Sheet from China*, Inv. Nos. 701-TA-591 and 731-TA-1399 (Prelim.), USITC Pub. 4757, 2018 WL 655049 (Jan. 2018)............................................................. 4, 31
*Common Alloy Aluminum Sheet From China; Determinations*, 84 Fed. Reg. 1,784 (Int'l Trade Comm. Feb. 5, 2019)........................................................................................................ 4
*Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813, 2019 WL 482272 (Feb. 8, 2019)............................................................. 4, 5
*Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157, 2019 WL 447442 (Int'l Trade Admin. Feb. 6, 2019) ................ 4, 5
*Common Alloy Aluminum Sheet From the People's Republic of China: Initiation of Less-Than Fair-Value and Countervailing Duty Investigations*, 82 Fed. Reg. 75,214, 2017 WL 5970991 (Dec. 4, 2017)......................................................................................................................... 2
*Common Alloy Aluminum Sheet From the People's Republic of China; Antidumping and Countervailing Duty Orders: Notice of Covered Merchandise Referral*, 86 Fed. Reg. 47,472 (Aug. 25, 2021) ...................................................................................................................... 6
*Countervailing Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 57, 427, 2018 WL 5980599 (Nov. 15, 2018) ..................................................................................................................... 4
Final Scope Determination at 4................................................................................................... 6
*Melamine Chemicals, Inc. v. United States*, 561 F. Supp. 458 (Ct. Int'l Trade 1983) ................ 17

Memorandum from Dana S. Mermelstein, Director, Office VI, Antidumping and Countervailing
Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and
Countervailing Duty Operations, *Subject: Antidumping and Countervailing Duty Orders on
Common Alloy Aluminum Sheet from the People's Republic of China, Enforcement and
Protect Act Investigation No. 7469: Notification of the Final Scope Determination and
Response to Covered Merchandise Referral* (Jan. 21, 2022)............................................ passim

Memorandum from P. Lee Smith, Deputy Assistant Secretary for Policy and Negotiations, to
Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty
Operations, performing the non-exclusive functions and duties of the Assistant Secretary for
Enforcement and Compliance, *Subject: Initiation of the Antidumping Duty Investigation of
Common Alloy Aluminum Sheet from the People's Republic of China* (Nov. 28, 2017);
Memorandum from P. Lee Smith, Deputy Assistant Secretary for Policy and Negotiations, to
Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty
Operations, performing the non-exclusive functions and duties of the Assistant Secretary for
Enforcement and Compliance, *Subject: Initiation of the Countervailing Duty Investigation of
Common Alloy Aluminum Sheet from the People's Republic of China* (Nov. 28, 2017)............ 3

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RULE 56.2**</u>
<u>**MOTION FOR JUDGEMENT ON THE AGENCY RECORD BY PLAINTIFF AA**</u>
<u>**METALS, INC.**</u>

Plaintiff AA Metals, Inc. ("AA Metals" or "Plaintiff"), by and through its attorneys, hereby submits the following memorandum in accordance with Rule 56.2(c) of the Rules of the Court of International Trade.

## I.   RULE 56.2 STATEMENT

### A.  THE ADMINISTRATIVE DETERMINATION UNDER REVIEW

Pursuant to 28 U.S.C. § 1581(c), Plaintiff challenges the U.S. Department of Commerce's ("Commerce") January 21, 2022 Final Scope Determination issued in response to a covered merchandise referral from U.S. Customs and Border Protection ("CBP") concerning the antidumping and countervailing duty orders on *Common Alloy Aluminum Sheet ("CAAS") from the People's Republic of China ("China")*.  *See* Memorandum from Dana S. Mermelstein, Director, Office VI, Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, *Subject: Antidumping and Countervailing Duty Orders on Common Alloy Aluminum Sheet from the People's Republic of China, Enforcement and Protect Act Investigation No. 7469: Notification of the Final Scope Determination and Response to Covered Merchandise Referral* (Jan. 21, 2022) ("Final Scope Determination").  P.R. 48.

### B.  ISSUES OF LAW PRESENTED

AA Metals brings this challenge to resolve the following issues of law presented herein:

(1) Whether Commerce's failure to notify AA Metals of deficiencies concerning the Scenario 2 product until issuance of the Final Scope Determination was unsupported by substantial evidence and was not in accordance with law.

1

(2) Whether Commerce's plain language analysis of the scope of the *China CAAS Orders* was unsupported by substantial evidence and not in accordance with law.

(3) Whether Commerce misapplied the primary criteria for determining scope under 19 C.F.R. § 351.225 by failing to consider the 19 C.F.R. § 351.225(k)(1) and thereby expanding the scope of the *Orders*.

(4) Whether Commerce's determination to include a certain temper expanded the scope of the *China CAAS Orders* to include merchandise not considered during the underlying investigation by Commerce and the International Trade Commission ("Commission" or "ITC") was not based on substantial evidence and was not in accordance with law.

(5) Whether Commerce's reliance on separate and distinct antidumping ("AD") and countervailing duty ("CVD") orders unlawfully expanded the scope of the *China CAAS Orders* and was not based on substantial evidence or in accordance with law.

(6) Whether Commerce's failure to address the substantial transformation of Scenario 2 product after entry into Turkey was not based on substantial evidence or in accordance with law.

## II.   STATEMENT OF FACTS

On November 28, 2017, Commerce self-initiated antidumping and countervailing duty investigations with respect to imports of common alloy aluminum sheet from China. *See Common Alloy Aluminum Sheet From the People's Republic of China: Initiation of Less-Than Fair-Value and Countervailing Duty Investigations*, 82 Fed. Reg. 75,214, 2017 WL 5970991 (Dec. 4, 2017); *see also* Memorandum from P. Lee Smith, Deputy Assistant Secretary for Policy and Negotiations, to Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance, *Subject: Initiation of the Antidumping Duty Investigation of*

*Common Alloy Aluminum Sheet from the People's Republic of China* (Nov. 28, 2017);
Memorandum from P. Lee Smith, Deputy Assistant Secretary for Policy and Negotiations, to Gary
Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations,
performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and
Compliance, *Subject: Initiation of the Countervailing Duty Investigation of Common Alloy
Aluminum Sheet from the People's Republic of China* (Nov. 28, 2017).

Following Commerce's self-initiation, the domestic industry had the opportunity to
comment on the scope established by Commerce in its *Initiation Memorandum*, but the domestic
industry did not submit scope comments.  Rather, the domestic industry only submitted product
characteristic comments, proposing product codes capturing the tempers of downstream CAAS
products made from re-roll stock established by Commerce.  *See* Letter from Kelley Drye &
Warren LLP to Dep't of Commerce, *Re: Common Alloy Aluminum Sheet From the People's
Republic of China – Domestic Industry's Product Characteristic Comments for Antidumping
Questionnaire* (Dec. 18, 2017) at 8.  P.R. 42 at Ex. 5; C.R. 11 at Ex. 5.

During the injury investigation, the International Trade Commission (the "Commission")
differentiated between re-roll and subject merchandise during its injury determination.  *Common
Alloy Aluminum Sheet from China*, Inv. Nos. 701-TA-591 and 731-TA-1399 (Final), USITC Pub.
4861, 2019 WL 494837 (Jan. 2019) at I-14 to I-18.  P.R. 43 at Ex. 6; C.R. 12 at Ex. 6.  In the
Commission's description of the manufacturing process of subject merchandise, re-roll stock is
the coiled aluminum alloy sheet resulting from the melting and refining and casting processes,
*before* the sheet is further manufactured into CAAS products through the flat-rolling process and
additional processes, including heat-treating, annealing, and/or finishing.  *Id.*; *see also Common
Alloy Aluminum Sheet from China*, Inv. Nos. 701-TA-591 and 731-TA-1399 (Prelim.), USITC

Pub. 4757, 2018 WL 655049 (Jan. 2018) at I-10 (defining the three distinct stages of manufacturing of subject CAAS as (1) melting and refining aluminum, (2) casting aluminum into semi-finished forms such as sheet ingot, and (3) rolling semi-finished forms into flat-rolled products such as aluminum sheet).  P.R. 43 at Ex. 7; C.R. 12 at Ex. 7.

In November 2018, Commerce published its affirmative final antidumping and countervailing duty determination.  *Antidumping Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Affirmative Final Determination of Sales at Less-Than-Fair Value*, 83 Fed. Reg. 57,421, 2018 WL 5980596 (Nov. 15, 2018); *Countervailing Duty Investigation of Common Alloy Aluminum Sheet From the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 57, 427, 2018 WL 5980599 (Nov. 15, 2018).

On February 5, 2019, the Commission published a notice of its affirmative finding that an industry in the United States is materially injured by reason of imports of common alloy aluminum sheet from China.  *See Common Alloy Aluminum Sheet From China; Determinations*, 84 Fed. Reg. 1,784 (Int'l Trade Comm. Feb. 5, 2019); *see also Common Alloy Aluminum Sheet from China*, USITC Pub. 4861. P.R. 43 at Ex. 6; C.R. 12 at Ex. 6.

In February 2019, Commerce issued antidumping and countervailing duty orders on common alloy aluminum sheet ("CAAS") from China ("*China CAAS Orders*").  *See Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813, 2019 WL 482272 (Feb. 8, 2019); *Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157, 2019 WL 447442 (Int'l Trade Admin. Feb. 6, 2019).

The *China CAAS Orders* cover, *inter alia*:

> The merchandise covered by this order is aluminum common alloy
> sheet (common alloy sheet), which is a flat-rolled aluminum product

4

> having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet.  With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

*China CAAS Orders* at 84 Fed. Reg. at 2,815, 2,158.

Aluminum can stock, which would otherwise meet the scope language above, is excluded from the *China CAAS Orders* based on the following language:

> Excluded from the scope of the order is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans.  Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, or H-391 temper.  In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans.  Aluminum can stock is properly classified under Harmonized Tariff Schedule of the United States (HTSUS) subheadings 7606.12.3045 and 7606.12.3055.

*Id*. at 2,815, 2,158-2,159.

Following the issuance of the *China CAAS Orders*, CBP initiated an investigation under the Enforce and Protect Act ("EAPA") as a result of the allegation submitted by Texarkana Aluminum, Inc. ("TKA" or "Alleger") that AA Metals imported re-rolled Chinese aluminum sheet from Turkish producers PMS Metal Profil Alüminyum San. Ve Tic. A.Ş. ("PMS") and Teknik Alüminyum Sanayi A.Ş. ("Teknik").  *See* Memorandum from Dana S. Mermelstein, Director, Office VI, Enforcement and Compliance, AD/CVD Operations, *Re: U.S. Customs and Border Protection Enforce and Protect Act Investigation No. 7468, Common Alloy Aluminum Sheet from the People's Republic of China, A-570-073/C-570-074, Subject: Placement of Covered*

*Merchandise Referral Documents on the Record* (Aug. 18, 2021) at 2 ("Covered Merchandise Referral").  P.R. 4.

Unable to determine whether the product imported by AA Metals from PMS or Teknik were subject to the *China CAAS Orders*, on May 13, 2021, CBP issued a Covered Merchandise Referral to Commerce pertaining to CBP's EAPA Investigation No. 7469 requesting that Commerce determine whether certain product imported by AA Metals was subject to the *China CAAS Orders* in accordance with 517(b)(4)(A) of the Tariff Act of 1930, *as amended*, and 19 C.F.R. § 165.16.  *See generally* Covered Merchandise Referral.  P.R. 4.  Specifically, CBP was "unable to determine whether the merchandise at issue is covered merchandise due to the third country processing."  *Id*. at 4.  CBP's Covered Merchandise Referral requested Commerce to make a scope determination on product meeting two different scenarios, distinguishing between the product imported from Teknik (Scenario 1) and the product imported from PMS (Scenario 2).  *Id*. CBP defined the product of Scenario 2 as follows: "Chinese-origin aluminum sheet of a thickness covered by the scope re-rolled in Turkey to a thickness covered by the scope."  *Id*.  On August 25, 2021, Commerce provided notice of the Covered Merchandise Referral and invited participation from interested parties.  *See Common Alloy Aluminum Sheet From the People's Republic of China; Antidumping and Countervailing Duty Orders: Notice of Covered Merchandise Referral*, 86 Fed. Reg. 47,472 (Aug. 25, 2021).  P.R. 7.

TKA submitted comments on the administrative record; however, these comments did not address the scope issues before Commerce with respect to Scenario 1 and Scenario 2.  In its Final Scope Determination, Commerce did not rely on any of the factual information or comments contained in the comments "because Texarkana's rebuttal comments do not directly rebut specific information in AA Metals initial response."  Final Scope Determination at 4.  The Aluminum

Association Common Alloy Sheet Trade Enforcement Working Group, comprised of domestic producers Arconic Corporation, Commonwealth Rolled Products Inc., Constellium Rolled Products Ravenswood, LLC, Jupiter Aluminum Company, JW Aluminum Company, and Novelis Corporation, also entered an appearance in the scope proceeding at Commerce.  P.R. 9; P.R. 10. However, the Aluminum Association Common Alloy Sheet Trade Enforcement Working Group did not participate in the scope proceeding by filing either factual information or comments.

On September 13, 2021, Commerce issued an initial questionnaire to AA Metals addressing information necessary for Commerce to complete its analysis in the scope inquiry.  *See* Letter from Brian C. Davis, Program Manager, AD/CVD Operations, Office VI, Enforcement and Compliance, to Sandler, Travis & Rosenberg, P.A., *Re: Covered Merchandise Referral Regarding EAPA Investigation No. 7469: Initial Questionnaire* (Sept. 13, 2021) ("Initial Questionnaire"). P.R. 14.  For each of the two scenarios, Commerce asked the following five questions:

> 1. Provide the technical characteristics and specifications of the Chinese-origin aluminum sheet shipped from China to Turkey.  2. Identify the Harmonized Tariff Schedule subheading under which the aluminum sheet enters Turkey. 3.  Describe the processing operations conducted in Turkey with respect to the Chinese-origin aluminum sheet.  4. Provide the technical characteristics and specifications of the aluminum sheet shipped from Turkey and entered into the United States.  5. Identify the Harmonized Tariff Schedule of the United States subheading under which the aluminum sheet enters the United States.

*Id*.  Commerce specifically noted that "if you do not have this information or are unable to provide it, please state so and explain the reason."  *Id*.

On September 27, 2021, AA Metals submitted its response to Commerce's initial questionnaire.  *See* Letter from Sandler, Travis & Rosenberg, P.A. to Dep't of Commerce, *Re: Common Alloy Aluminum Sheet from the People's Republic of China: Response to Initial Questionnaire* (Sept. 27, 2021) ("Initial Questionnaire Response").  P.R. 20-25; C.R. 1-6.  With

Court No. 22-00051

respect to Scenario 2, AA Metals defined the product as continuous cast coil with a thickness of 3-20 mm, which is considered primary unwrought aluminum (*i.e.*, not a direct chill cast product). *Id*. at 3.  The Initial Questionnaire Response provided technical specifications of the product at the time of import into Turkey that subsequently underwent further manufacturing by PMS in Turkey and was imported by AA Metals.  *Id*. at 3-4, Ex. 6.  P.R. 20; C.R. 1.  These technical specifications confirmed that the product, at the time of entry into Turkey, was [ ] temper.  *Id*.  Additionally, AA Metals confirmed that AA Metals and PMS were in no way related and, therefore, AA Metals was unable to provide information related to PMS' business or operations or speak to the Turkish import documents.  *Id*. at 1-2.

On October 27, 2021, Commerce issued a supplemental questionnaire.  Letter from Brian C. Davis, Program Manager, AD/CVD Operations, Office VI, Enforcement and Compliance, to Sandler, Travis & Rosenberg, P.A., *Re: Covered Merchandise Referral Regarding EAPA Investigation No. 7469: Supplemental Questionnaire* (Oct. 27, 2021) ("Supplemental Questionnaire").  P.R. 38; C.R. 9.  With respect to Scenario 2, Commerce did not question the product specifications or description as provided by AA Metals.  Rather, in the Supplemental Questionnaire, Commerce repeatedly called the Scenario 2 product "continuous cast coil."  *Id*. at 3-4 ("{t}he continuous cast coil in Scenario 2 appears to meet the physical description of the scope of the orders . . ." and "the chemical composition of the continuous cast coil in Scenario 2. . ."). The Supplemental Questionnaire requested AA Metals to describe how the Scenario 2 merchandise "exported from Turkey to the United States . . . meet the physical description of the scope of the {*CAAS China Orders*}" and to provide responses to the following three questions:

> (a) Please justify with supporting documents your claim that continuous cast coil is primary unwrought aluminum, despite its thickness indicating that it is aluminum sheet within the description of the scope of the orders.  (b) Please justify with supporting

documents your claim that continuous cast coil is primary unwrought aluminum, despite its chemical composition indicating that it is alloy aluminum sheet within the description of the scope of the orders.  (c) Please explain with supporting documents whether primary unwrought aluminum is not alloyed aluminum and is non-scope product, regardless of thickness, shape, and/or chemical composition.

*Id*. at 1, 4.

On November 5, 2021, AA Metals responded to Commerce's Supplemental Questionnaire. *See* Letter from Sandler, Travis & Rosenberg, P.A. to Dep't of Commerce, *Re: Common Alloy Aluminum Sheet from the People's Republic of China: AA Metals Inc. and Teknik Aluminyum Sanayi A.S. – Supplemental Questionnaire* (Nov. 5, 2021) ("Supplemental Questionnaire Response").  P.R. 42-46; C.R. 11-15.  In response to question 1, AA Metals provided that "{w}hile the merchandise at the time of export from Turkey meets the physical description alone of the *China CAAS Orders*, the product exported from China to Turkey is non-subject merchandise that has undergone substantial transformation such that the merchandise is Turkish origin for duty purposes."  *Id*. at 13.  P.R. 42; C.R. 11.  AA Metals set forth that the Chinese product is non-subject for the following reasons: (1) the input is continuous cast coil which is unwrought aluminum which is manufactured by casting without hot- or cold-rolling and (2) a certain temper product is non-subject merchandise.  In response to the question regarding continuous cast coil, AA Metals provided information regarding unwrought aluminum.  *Id*. at 17-25.  Additionally, AA Metals provided Commerce with previous Commerce determinations addressing substantial transformation.  *Id.* at 15.

On January 25, 2022, Commerce issued its final scope determination and response to CBP's Covered Merchandise Referral, dated January 21, 2022.  *See* Final Scope Determination. P.R. 48; *see also* Memorandum from Yang Jin Chun, Senior International Trade Compliance

Analyst, AD/CVD Operations, Office VI, *Subject*: *Common Alloy Aluminum Sheet from the People's Republic of China: Scope Inquiry EAPA 7469 – Service of Final Scope Determination* (Jan. 26, 2022).  P.R. 48.

In the Final Scope Determination, Commerce determined that common alloy aluminum sheet re-rolled by Turkish producer Teknik as set forth in Scenario 1 is not covered by the scope of the *CAAS China Orders*.  Final Scope Determination at 1.  P.R. 49.  Commerce also determined that common alloy aluminum sheet re-rolled by Turkish producer PMS as set forth in Scenario 2 is covered by the scope of the *China CAAS Orders*.  *Id*.  With respect to Scenario 2, Commerce determined that "the aluminum coil exported from China to Turkey is flat-rolled aluminum sheet having a thickness of 6.3 mm or less, but greater than 0.2 mm, not continuous cast coil and unwrought aluminum manufactured by casting."  *Id*. at 8.

Commerce's Final Scope Determination also found that Scenario 2 was not excluded based on the temper of the product.  *Id*. at 9.  Commerce found that the scope of the *China CAAS Orders* provides a limited exclusion based on temper standards (*i.e.*, certain aluminum can stock with H-19, H-41, H-48, or H-391 temper) and the scope does not provide any additional exclusion based on temper standard or temper-specific product description.  *Id*.  Commerce, in part, based its determination on temper on Commerce's findings in a separate investigation and subsequent orders of common alloy aluminum sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey.  *Id*.  Finally, Commerce's Final Scope Determination found the plain scope language dispositive and found further analysis of the factors listed in 19 C.F.R. §§ 351.225(k)(1), (k)(2) "unnecessary."  *Id*. at 10.

On January 31, 2022, Commerce issued cash deposit instructions to CBP which stated, in part, "{b}ecause both the Chinese-origin common alloy aluminum sheet input and the finished common alloy aluminum sheet re-rolled in Turkey satisfy the description of the scope of the orders, Commerce found this product to be within the scope of the orders." *RE: Affirmative final covered merchandise determination on antidumping and countervailing duty orders on common alloy aluminum sheet from the People's Republic of China (A-570-073, C-570-074)*, Message No. 2031405 (Jan. 31, 2022). P.R. 51. Commerce instructed CBP to continue to suspend liquidation of entries of the Chinese-origin common alloy aluminum sheet input re-rolled in Turkey by Turkish producer PMS, exported from Turkey to the United States, and imported by AA Metals, subject to the *China CAAS Orders*. *Id*. at ¶3.

## III.   SUMMARY OF ARGUMENT

Commerce's Final Scope Determination unlawfully expanded the scope of the *China CAAS Orders*. First, Commerce's determination that Scenario 2 product was "not continuous cast coil and unwrought aluminum manufactured by casting" is not in accordance with law. Commerce described Scenario 2 product as "continuous cast coil" during the pendency of the proceeding in the Supplemental Questionnaire. The questions issued to AA Metals in the Supplemental Questionnaire indicate that Commerce was solely focused on how the "continuous cast coil" of Scenario 2 was non-subject merchandise. In other words, Commerce was not focused on questioning the status or description of Scenario 2 at the time of entry into Turkey as a "continuous cast coil." AA Metal's reliance on Commerce's assertions in the Supplemental Questionnaire was reasonable. The Final Scope Determination was the first notification to AA Metals that Commerce did not deem the product set forth in Scenario 2 to be "continuous cast coil."

Second, even if *in arguendo* Commerce properly deemed Scenario 2 merchandise "not continuous cast coil," Commerce's Final Scope Determination expanded the scope of the *China*

11

*CAAS Orders* by including [ ] temper, an upstream, unfinished CAAS product that must undergo further processing (*i.e.*, rolling) in order be considered a finished CAAS product with the mechanical properties of subject merchandise.  In this matter, the administrative record demonstrates critical differences in mechanical proprieties as recognized by the industry established standards and customs set forth by the Aluminum Association that distinguish subject merchandise from Scenario 2 product.  The distinctions between subject merchandise and Scenario 2 product at the time of entry into Turkey are absent from the Final Scope Determination.

Additionally, despite AA Metals pointing to (k)(1) sources to support the position that [ ] temper was excluded from the scope of the *China CAAS Orders*, Commerce deemed a review of the (k)(1) sources "unnecessary."  Commerce unlawfully ignored substantial evidence submitted by AA Metals from the original investigation, including the descriptions of the merchandise contained in the petition, the initial investigation, and the Commission's injury determinations that certain tempers were not subject to the underlying investigation.  Commerce was required to address the (k)(1) factors and failure to address these factors renders the Final Scope Determination unlawful.

Third, Commerce's Final Scope Determination expanded the scope of the *China CAAS Orders* to include merchandise not considered during the underlying investigation by the Commission.  The administrative record demonstrates that the upstream product was not considered in the Commission's pricing analysis and subsequent injury analysis.  The Commission's affirmative injury determination demonstrates the manufacturing necessary for subject merchandise.  This highlights the importance of rolling in imparting the mechanical properties of subject merchandise.  Here, the [ ] temper, at the time of entry into Turkey was not

included as part of the Commission's injury analysis.  Therefore, the Final Scope Determination is unlawful.

Fourth, Commerce based its determination concerning [   ] temper, in part, on Commerce's separate investigation and subsequent order of common alloy aluminum sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey.  Commerce's reliance on a different order with a different underlying petitioner, investigation, interested parties, scope comments and analysis, and injury determination is arbitrary, capricious, and otherwise not in accordance with law.

Finally, Commerce's failure to address the substantial transformation of Scenario 2 after import into Turkey was unlawful.  The administrative record demonstrates that, following processing in Turkey, the mechanical properties that rendered Scenario 2 CAAS product at the time of entry into the United States were imparted in Turkey as a result of this Turkish manufacturing.  Despite the robust administrative record demonstrating this substantial transformation and discussing Commerce's own precedent finding that rolling constitutes a substantial transformation and confers origin, Commerce failed to consider or address this issue in its Final Scope Determination.  Failure to consider the substantial transformation that resulted from Turkish processing and to address this record information renders Commerce's *Final Scope Determination* unsupported by substantial evidence and is otherwise not in accordance with law.

## IV.   ARGUMENT

### A.  STANDARD OF REVIEW

Commerce must base its determination on "substantial evidence," consistent with 19 U.S.C. § 1516a(b)(1)(B)(i), including "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477

(1951) (*quoting Consol. Edison Co. of New York. v. NLRB*, 305 U.S. 197, 229 (1938)). Commerce's determinations must not be arbitrary and must be in accordance with law.   *Id*. Substantial evidence review requires consideration of "the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation omitted), and asks, in light of that evidence, whether Commerce's determination was reasonable. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

To support its findings, Commerce must also "explain the standards that it applied and demonstrate a rational connection between the facts on the record and the conclusions drawn." *Matsushita Elc. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  Such explanations "must be reasonably discernible to a reviewing court."  *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  A determination is arbitrary and, therefore, not in accordance with law, if "the agency . . . relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, . . . or is so implausible that it could not be ascribed to . . . the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) (invalidating exercise of agency discretion where agency failed to explain basis of its actions); *Canadian Wheat Bd. v. United States*, 641 F. 3d 1344, 1352 (Fed. Cir. 2011) (declining to accord deference to Commerce's interpretation of the statute for failing to provide reasoned explanation for its action).

### C.  LEGAL FRAMEWORK FOR SCOPE DETERMINATIONS[1]

Commerce's determination "is not in accordance with the law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms."  *Meridian Prods., LLC v. United* States, 851 F.3d 1375, 1382 (Fed. Cir. 2017); *see also N. Polites v. United States*, 755 F. Supp. 2d 1352, 1356 (Ct. Int'l Trade 2011) (*citing Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004)).  Although Commerce enjoys "substantial freedom to interpret and clarify its antidumping duty orders . . . it may not change them."  *Ericsson GE Mobile Commc'ns v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995).  The framework for evaluating scope applications is set forth in Commerce's regulations.  19 C.F.R. § 351.225(k) provides:

> In considering whether a particular product is included within the scope of an order or a suspended investigation, the Secretary <u>will</u> take into account the following:
>
> 1.  The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission.
> 2.  When the above criteria are not dispositive, the Secretary will further consider:
>
>     i.   The physical characteristics of the product;
>     ii.  The expectations of the ultimate purchasers;
>     iii. The ultimate use of the product;
>     iv.  The channels of trade in which the product is sold; and
>     v.   The manner in which the product is advertised and displayed.

---

[1] We note that Commerce received the Covered Merchandise Referral from CBP on May 13, 2021, prior to the November 4, 2021 effective date of Commerce's revised regulations.  *See Regulations to Improve Administrative and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52300 (Sept. 20, 2021).  As set forth in the revised regulations, "{a}mendments to § 351.225 and corresponding amendments to §§ 351.103(d) and 351.305(d) apply to scope inquiries for which a scope ruling application is filed, as well as any scope inquiry self-initiated by Commerce, on or after November 4, 2021."  *Id*.  Additionally, "{n}ew § 351.227 and corresponding amendments to § 351.103(d) and § 351.305(d) apply to covered merchandise inquiries for which a covered merchandise referral determined to be sufficient is received on or after November 4, 2021."  *Id*.  As a result, the new regulations are not applicable to the Final Scope Determination.

19 C.F.R. § 351.225(k) (emphasis added).

The Court of Appeals for the Federal Circuit ("CAFC") has held that in evaluating the initial "plain meaning" a "scope determination must be supported by substantial evidence, considering the § 351.225(k)(1) criteria, in view of the record as a whole – including evidence that {certain merchandise} was excluded from Commerce's and the Commission's investigations." *A.L. Patterson, Inc. v. United States,* 585 Fed. Appx. 778, 784 (Fed. Cir. 2014).   The Court instructed:

> Even when merchandise is facially covered by the literal language of the order, it may still be outside the scope if 'the order can reasonably be interpreted so as to exclude it.' . . . this principle applies even though we recognize that antidumping orders are often broadly drawn, since 'descriptions of the subject merchandise must be written in general terms.' . . . Nevertheless, Commerce must still assess the § 351.225(k)(1) criteria, which by plain language of the regulation extends inquiry beyond the description of the product in the antidumping order.

*Id*.

This Court has also reasoned:

> The court acknowledges that the language in the final order, not the sources provided for under 19 C.F.R. § 351.225(k)(1), reflects what merchandise is included within and excluded from the scope. . . . However, the (k)(1) sources are afforded primacy in the scope analysis . . . because interpretation of the language used in the orders must be based on the meaning given to that language during the underlying investigations.

*United Steel & Fasteners, Inc. v. United States*, 203 F. Supp. 3d 1235, 1242 (Ct. Int'l Trade 2017).

Finally, the CAFC has found that Commerce must place the literal language of an order in its proper context.   *See e.g.*, *Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ("{c}ourts have long recognized the importance of considering context,

16

including industry custom, in interpreting written language"); *Cablesa S.A. de C.V. v. United States*, 31 C.I.T. 252, 260 (2007) (affirming Commerce's determination that the scope should be based on industry standards rather than a dictionary).

### D. COMMERCE FAILED TO ALLOW AA METALS TO ADDRESS AND CORRECT THE RECORD IN LIGHT OF COMMERCE'S DEEMED DEFICIENCY CONCERNING SCENARIO 2 PRODUCT

Commerce determined that the Scenario 2 product was "not continuous cast coil and unwrought aluminum manufactured by casting."  Final Scope Determination at 8 (citations omitted).  P.R. 48.  Commerce also concluded that there was "no information in purchase documents to support its claim that the Chinese aluminum coil is continuous cast coil."  *Id*. at 9. The Final Scope Determination was the first notification to AA Metals that Commerce did not deem the product set forth in Scenario 2 to be "continuous cast coil."  Rather, Commerce described Scenario 2 product as "continuous cast coil" in the Supplemental Questionnaire.  In instances where there is a deficiency in the information of record, Commerce is required to let interested parties know that Commerce deems the information deficient and allow the party to place information on the record to correct the deemed deficiency, particularly in instances, as is the case here, where an interested party has provided Commerce with voluminous information and actively participated throughout the proceeding.  As a result, the Final Scope Determination is not in accordance with law.

It is well established that "{t}he standards of fairness and reasonableness are inherent" in trade laws.  *See e.g., Melamine Chemicals, Inc. v. United States*, 561 F. Supp. 458, 463 (Ct. Int'l Trade 1983).  Commerce's basic reasonability under the law to conduct a fair investigation is an inherent obligation.  This is particularly true where the information goes to the "heart of the issue." The question of whether or not Scenario 2 product was continuous cast coil is one of the two

foundations of AA Metals' arguments of why Scenario 2 product is non-subject merchandise. Without knowledge that Commerce questioned the actual product characteristics – not just whether the product as described was subject merchandise, AA Metals was unable to adequately participate in the scope proceeding. Commerce's actions in this proceeding are particularly troublesome when one considers that this is a Covered Merchandise Referral, meaning that CBP has a record before it and CBP is unable to determine whether this clearly defined product is subject to the *China CAAS Orders* for purposes of making an evasion determination.

In the Initial Questionnaire, Commerce requested AA Metals to "provide the technical characteristics and specifications of the Chinese-origin aluminum sheet shipped from China to Turkey" for Scenario 2. *See* Initial Questionnaire at 3. P.R. 14. In response, AA Metals provided the following specifications for Commerce's scope analysis: "[            ] continuous cast coil with a thickness of [    ] mm (*i.e.*, primary unwrought aluminum and out of scope of the Chinese CAAS Orders), shipped from China to Turkey to undergo further manufacturing." Initial Questionnaire Response at 3. P.R. 20; C.R. 1. AA Metals provided information related to the technical specifications of the product at the time of import into Turkey. Specifically, the "Chinese-origin aluminum sheet is a continuous cast coil with a thickness of 3-20 mm, which is considered Primary Unwrought aluminum (*i.e.*, not a direct chill cast product)" and that Scenario 2 consisted of continuous cast coil, aluminum alloy [      ], [  ] temper with dimensions of [         ] mm. Following further processing in Turkey, the product entered the United States as [         ] aluminum coil with a dimension of [        ] (*i.e.*, [           ] mm) and [           ] aluminum coil with a dimension of [        ] (*i.e.*, [          ] mm). *See id*. at 9-10. AA Metals also submitted documentation related to the Chinese product at the time of entry into Turkey in its initial questionnaire at Exhibit 6. *See id*. at Ex. 6. P.R. 22; C.R. 3.

Commerce's Supplemental Questionnaire did not question the status of the product as continuous cast coil at the time of entry into Turkey.   Rather, Commerce's Supplemental Questionnaire specifically referred to Scenario 2 as "continuous cast coil" and asked multiple questions as to justify how the "continuous cast coil" is primary unwrought aluminum and therefore is non-subject merchandise.  *Id*.  at 3-4 ("{t}he continuous cast coil in Scenario 2 appears to meet the physical description of the scope of the orders . . ." and "the chemical composition of the continuous cast coil in Scenario 2. . .").  P.R. 38; C.R. 9.  The Supplemental Questionnaire requested AA Metals to describe how the Scenario 2 merchandise "exported from Turkey to the United States . . . meet the physical description of the scope of the {*CAAS China Orders*}."  In other words, Commerce was focused on the physical description of the Scenario 2 product after further manufacturing in Turkey and at the time of entry into the United States, questioning if the Scenario 2 product at entry into the United States would otherwise meet the scope language of the *China CAAS Orders* but for the further manufacturing in Turkey.

Additionally, Commerce asked AA Metals to provide responses to the following three questions:

> (a) Please justify with supporting documents your claim that continuous cast coil is primary unwrought aluminum, despite its thickness indicating that it is aluminum sheet within the description of the scope of the orders.  (b) Please justify with supporting documents your claim that continuous cast coil is primary unwrought aluminum, despite its chemical composition indicating that it is alloy aluminum sheet within the description of the scope of the orders.  (c) Please explain with supporting documents whether primary unwrought aluminum is not alloyed aluminum and is non-scope product, regardless of thickness, shape, and/or chemical composition.

*Id*. at 1, 4.  Commerce did not question the documentation of record at the time of entry into Turkey, the product descriptions of the product at the time of entry into Turkey certified by AA

Metals, or the fact that Scenario 2 was deemed "continuous cast coil" throughout the pendency of the scope proceeding. The questions set forth above indicate that Commerce was solely focused on how the "continuous cast coil" of Scenario 2 was non-subject merchandise, *i.e.*, Commerce was not focused on questioning the status of Scenario 2 at the time of entry into Turkey as a "continuous cast coil."

The first time AA Metals was provided notice that Commerce did not deem Scenario 2 "continuous cast coil" at the time of entry into Turkey was at the issuance of the Final Scope Determination. Final Scope Determination at 8 (citations omitted). P.R. 48. Commerce's conclusions that the Scenario 2 product was not continuous cast rests on the unreasonable assertion that AA Metals should have known that Commerce deemed the administrative record inadequate to demonstrate that the Scenario 2 product was in fact continuous cast coil.

Finally, Commerce cannot disregard AA Metals' questionnaire responses detailing the merchandise under Scenario 2 at the time of import into Turkey. Each response to Commerce's questionnaires or submission containing factual information must include a company certification certifying that the factual information provided to Commerce is accurate and complete. *See* 19 C.F.R. § 351.303(g). The factual information provided by AA Metals detailing Scenario 2 as a continuous cast product were made truthfully and supported by signed factual certifications of their accuracy pursuant to 19 C.F.R. § 351.303(g)(1). Furthermore, AA Metals' representative also certified that the "information contained in this submission is accurate and complete to the best of my knowledge." 19 C.F.R. § 351.303(g)(2). Absent evidence to the contrary, Commerce cannot improperly disregard evidence on the record in light of such certifications. Commerce's conclusion that the imported product was not continuous cast coil is unsupported by the record.

Accordingly, Commerce's determination that the product subject to Scenario 2 is not continuous cast coil is unreasonable and not in accordance with law.

### E. COMMERCE'S PLAIN LANGUAGE ANALYSIS OF THE *CHINA CAAS ORDERS* SCOPE LANGUAGE IS UNREASONABLE, ARBITRARY, AND NOT SUPPORTED BY LAW

Even if *in arguendo* Commerce properly deemed Scenario 2 merchandise "not continuous cast coil," Commerce's Final Scope Determination amounts to a *post hoc* scope expansion following the issuance of the *China CAAS Orders* as a result of Commerce's inclusion of [ ] temper. Final Scope Determination at 9. P.R. 48. Commerce's Final Scope Determination failed to properly consider the plain language of the scope and Commerce misapplied the primary criteria for determining scope (*e.g.*, Commerce's description of the scope in the *Orders*, the petition, and decisions of Commerce and the ITC). 19 C.F.R. § 351.225(k)(1). Commerce unlawfully expanded the scope of the *Orders* by including temper standards of the Aluminum Association not included in the underlying investigation. Therefore, Commerce's Final Scope Determination was not based upon substantial evidence of record or otherwise in accordance with the law.

Although Commerce is entitled to "substantial deference with regard to its interpretation of its own antidumping duty orders," *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (internal citation omitted), "Commerce may not 'interpret' an antidumping duty so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (internal citations omitted). Indeed, "a scope determination is merely a clarification of the terms of the original antidumping order; it does not modify the order from its terms." *Alsthom Atlantique, et al. v. United States*, 787 F.2d 565 (Fed. Cir. 1986).

The CAFC has held that in evaluating the initial "plain meaning" a "scope determination must be supported by substantial evidence, considering the § 351.225(k)(1) criteria, in view of the record as a whole – including evidence that {certain merchandise} was excluded from Commerce's and the Commission's investigations." *A.L. Patterson,* 585 Fed. Appx. at 784.  This Court has likewise directed Commerce's requirements to address (k)(1) sources, particularly when, as the case is here, the interested party cites the (k)(1) sources as supporting a product's exclusion from the scope of an order.  *See e.g.*, *TMB 44AOE, Inc v. United States*, 399 F.Supp.3d 1314 (Ct. Int'l Trade 2019).  This Court's findings in *TMB 440AE, Inc. v. United States* are instructive to the case at hand.  *TMB 44AOE*, 399 F.Supp.3d 1314.  *TMB 440AE* addressed whether pipe that is threaded to meet a particular aerospace threading standard after importation should be excluded from the antidumping and countervailing duty orders on certain seamless standard carbon and alloy steel pipe because the pipe met the scope's "aerospace exclusion."  In the contested decision, Commerce determined that the orders were unambiguous and found the pipe to be subject to the orders.  *Id*. at 17, 18.  The Court remanded on the basis that Commerce was required to consult (k)(1) sources in considering whether the pipe was properly included within the order.  *Id*. at 21.  As provided in *TMB 440AE*:

> {W}hen a respondent cites(k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources. *See Meridian*, 851 F.3d at 1383 (noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed 19 C.F.R. § 351.225(k)(1) sources, is unambiguous").

*TMB 44AOE*, 399 F.Supp.3d at 1320.

While Commerce may base a scope decision on the plain language of the scope, it may not change its terms.  The (k)(1) criteria must be considered to confirm that a scope interpretation does

not unlawfully expand the scope of an order.  In its Final Scope Determination, Commerce found

that "{t}he scope of the Orders provides a limited exclusion based on temper standards, *i.e.,* certain

aluminum can stock with H-19, H-41, H-48, or H-391 temper are excluded from the scope of the

*Orders*."  Final Scope Determination at 9.  P.R. 48.  Commerce went on to state that the "aluminum

sheet exported from China to Turkey in Scenario 2 does not meet these limited temper exclusions

requirements" and "the scope of the *Orders* does not provide any additional exclusion based on

temper standard or temper-specific product description."   *Id.* (internal citations omitted).

Commerce's analysis is selective and impermissible by law as it expands the *China CAAS Orders*.

Moreover, AA Metals sufficiently challenged the inclusion of its Scenario 2 product in the *China*

*CAAS Orders* based on (k)(1) sources.  As such, "Commerce was not free to ignore these (k)(1)

sources.  Whether the order is ambiguous or not, Commerce's regulations are unambiguous– it

"<u>will</u> take into account" the (k)(1) criteria in conducting a scope determination.   19 C.F.R.

351.225(k) (emphasis added).  No case has invalidated this regulatory requirement." *TMB 44AOE*,

399 F.Supp.3d at 1320.

As detailed below, the administrative record before Commerce established that [  ] temper

is non-subject merchandise.  First, Commerce's scope analysis and reliance on the exclusion for

aluminum can stock was improper.  Second, the administrative record contains information related

to the mechanical differences between upstream, [  ] temper product and subject downstream,

finished CAAS products.  Commerce's failure to address this information renders its Final Scope

Determinations unlawful.  Finally, the (k)(1) sources support AA Metals' arguments that [  ]

temper is not subject to the *China CAAS Orders*.

### 1.  Commerce's Decision Unlawfully Expands the *China CAAS Orders*

First, with respect to Commerce's limited reading of the exclusion language of the *Orders*,

aluminum can stock, as a flat-rolled aluminum CAAS product within a continuum of gauges

covered by the scope of investigation, is a hard ("H") tempered product. Final Scope Determination at 8. Here, aluminum can stock, having a H-19, H-41, H-48, or H-391 temper, would have been deemed subject merchandise but-for the specific exclusion set forth in the scope language. There was never a question that H tempered products were deemed subject merchandise based on the mechanical properties of the product and its inclusion at the time of initiation. Absent the specific exclusion, aluminum can stock is subject merchandise. This exclusion language for aluminum can stock on its face does not, however, mean any and all other tempers are subject merchandise. This exclusion language has no impact on the fact that [ ] temper products do not have the mechanical properties of subject merchandise as an upstream, unfinished product. This is particularly true when the underlying administrative record of the investigation and product information provided by AA Metals confirms that the mechanical properties of certain tempers would *de facto* exclude certain tempers, as the case is here.

Second, in the Supplemental Questionnaire Response, AA Metals provided detailed information concerning the distinction between subject merchandise and [ ] temper products in terms of mechanical properties. For the Court's reference, "tempering is a heat treating process that is used to strengthen or harden metal. The Aluminum Association identifies various aluminum products by specifying both an alloy and a temper for that product." *See* Supplemental Questionnaire Response at Exhibit 6, I-13, fn 37. P.R. 43; C.R. 12. [

]. *Id*. at 3 (citing Exhibit 7). P.R. 42, 43; C.R. 11, 12; *see also id*. at 13 (detailing Scenario 2 product). P.R. 42; C.R. 11. [

]. *Id*. at 3. This absence of an industry standard for the mechanical

properties of [  ] temper confirms the dividing line between [  ] temper and downstream subject CAAS products.  Subject "CAAS derives its strength and formability through specific processing steps consisting of strain hardening obtained by cold-rolling to lower gauges, inter-annealing and stabilize anneal.  By contrast, [          ] products are semi-finished products that will be used for subsequent shaping, finishing or thermal processing to create other finished forms."  *Id.* at 3-4.

The distinctions between subject merchandise and Scenario 2 product are absent from the Final Scope Determination.  The Federal Circuit's decision in *Arcelormittal Stainless Belg. N.V. v. United States* is particularly relevant to this case as it recognizes "{'}the importance of considering context, including industry custom, in interpreting written language' . . . Because the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage."  *Arcelormittal Stainless Belg.,* 694 F.3d at 88.  In this matter, the administrative record demonstrates critical differences in mechanical proprieties as recognized by the industry established standards and customs set forth by the Aluminum Association that distinguish subject merchandise from Scenario 2 product.

## 2.   Commerce was Required to Address 19 C.F.R. § 351.225(k)(1)

With respect to Scenario 2, Commerce failed to consider the criteria set forth in 19 C.F.R. § 351.225(k)(1), deeming such consideration "unnecessary" in issuance of a scope determination concerning Scenario 2 merchandise.  The Court of the Appeals for the Federal Circuit held in *Eckstrom Indus., Inc. v. United States* that "Commerce cannot 'interpret' an anti-dumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms."  *Eckstrom Indus.*, 254 F.3d at 1072.  Here, Commerce's failure to analyze factors set forth in 19 C.F.R. § 351.225(k)(1) when considering whether the scope of the *China CAAS Orders* includes Scenario 2 merchandise is not supported by substantial evidence and is contrary to law.

Commerce may not ignore (k)(1) factors and change the scope of an order claiming the language was unambiguous.

Commerce's inclusion of tempers not considered as subject merchandise in the underlying investigation highlights Commerce's improper failure to analyze the (k)(1) factors in this case. Commerce unlawfully rejected substantial evidence submitted by AA Metals from the original investigation, including the descriptions of the merchandise contained in the petition, the initial investigation, and the Commission's injury determinations that certain tempers were not subject to the underlying investigation. *See* Supplemental Questionnaire Response at 3-4, 13, Exhibit 5, and Exhibit 6. P.R. 42, 43; C.R. 11, 12.

A review of the (k)(1) sources directly undermines Commerce's Final Scope Determination. In addition to the distinctions in mechanical properties between the tempers, the administrative record of the underlying investigation confirms that subject merchandise includes certain tempers based on the mechanical properties and by definition excludes [            ]. As a result of Commerce's self-initiation of the underlying investigation, the scope language was set forth by Commerce in its notice of initiation. Following initiation, Commerce provided interested parties, including the domestic industry, the opportunity to comment on the scope of the investigation. The domestic industry only proposed product codes capturing the tempers of downstream CAAS products made from re-roll stock, rather than the inclusion of re-roll, *i.e.*, [

] product. *Id*. at 4. P.R. 42; C.R. 11; *see also id*. at 13; *id*. at Exhibit 5. The domestic industry did not propose the inclusion of [            ]. *Id*. at 4 P.R. 42; C.R. 11; *see also id*. at 13; *id*. at Exhibit 5.

The Commission also differentiated between re-roll and subject merchandise during its injury determination. In the Commission's description of the manufacturing process of subject

merchandise, re-roll stock, *i.e.*, [      ] temper, is the coiled aluminum alloy sheet resulting from the melting and refining and casting processes, *before* the sheet is further manufactured into CAAS products through the flat-rolling process and additional processes, including heat-treating, annealing, and/or finishing.   Importantly, the Commission's pricing analysis for its final determination did not include [                ], but rather was focused on H and O temper products. *Id.* at 4.  P.R. 42; C.R. 11*; see also id*. at Exhibit 6 (containing excerpts from USITC Pub. 4861). P.R. 43; C.R. 12; *id*. at Exhibit 7 (containing excerpts from the Commission's Prehearing Staff Report).

Commerce's determination concerning tempers subject to the *China CAAS Orders* is unreasonable and results in merchandise that does not match the mechanical properties of subject merchandise to be placed under the scope of the *China CAAS Orders.*  Additionally, Commerce's failure to analyze factors set forth in 19 C.F.R. § 351.225(k)(1) when considering whether the scope of the *China CAAS Orders* includes Scenario 2 merchandise is not supported by substantial evidence and is contrary to law.   Commerce's failure to consider the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission," as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Determination was not in accordance with law.

As outlined above, the (k)(1) sources are dispositive on the issue on the record before the Court: [ ] temper was not considered by either Commerce or the Commission during the underlying investigation and is therefore non-subject merchandise.  As a result, Commerce erred in its Final Scope Determination.  The Court should therefore remand this matter with instructions that Commerce reverse its scope determination with respect to Scenario 2.  In the event that this Court remands the matter, the Court must instruct Commerce to properly consider the (k)(1)

sources.  Moreover, on remand if the criteria listed in 19 C.F.R. § 351.225(k)(1) are not dispositive, then Commerce must consider additional criteria set forth at 19 C.F.R. § 351.225(k)(2) in determining whether the Scenario 2 product is properly included within the scope of the *China CAAS Orders*.  *See* 19 C.F.R. § 351.225(d); 19 C.F.R. § 351.225(k)(1); *Diversified Products Corp. v. United States*, 572 F. Supp. 883, 889 (Ct. Int'l Trade 1983).

### F.   COMMERCE EXPANDED THE SCOPE OF THE *CHINA CAAS ORDERS* TO INCLUDE MERCHANDISE NOT CONSIDERED DURING THE UNDERLYING INVESTIGATION BY THE COMMISSION

In the Final Scope Determination, Commerce expanded the scope of the *China CAAS Orders* to include merchandise not considered during the underlying investigation by the Commission.  Specifically, Commerce's Final Scope Determination renders (1) continuous cast coil and (2) [  ] temper product, as defined by Scenario 2 as subject merchandise.  However, the Commission's injury analysis did not consider such products.  Merchandise may only be placed under the scope of an order where there has been an affirmative injury determination by the Commission.  *See* 19 U.S.C. § 1673 (requiring an injury determination by the Commission before the imposition of antidumping duties); 19 U.S.C. § 1671 (requiring an injury determination by the Commission before the imposition of countervailing duties); *see e.g.*, *Allegheny Bradford Corp.*, 342 F. Supp. 2d at 1187-1190.  This part of the AD/CVD investigatory process is not optional.

In *A.L. Patterson*, this Court noted that "Commerce cannot include in the final order merchandise for which there was no investigation and for which there was no determination of sales at LTFV or determination of injury," and directed Commerce on remand to consider Patterson's evidence that coil rods were not part of the underlying investigations.  *A.L. Patterson, Inc.*, 585 Fed. Appx. at 784.  Following a remand to Commerce, this Court ruled (in a one-page Order) that Patterson's coil rod was subject to the AD Order.  *A.L. Patterson, Inc. v. United States*,

Court No. 11-00192 (Ct. Int'l Trade May 22, 2013) (ECF No. 56).  However, that decision was

reversed on appeal by the Federal Circuit in an unpublished opinion.  In finding the coil rod not

subject to the AD order, the appellate court stated that "{t}he scope determination must be

supported by substantial evidence considering the § 351.225(k)(1) criteria, in view of the record

as a whole – ***including evidence that coil and rod was excluded from Commerce's and the***

***Commission's investigations***."  *A.L. Patterson, Inc. v. United States*, 585 Fed. Appx. at 784

(emphasis added) ("{T}here is insufficient evidence to conclude that {plaintiff's merchandise} . .

. was part of the {ITC's} material injury investigation. As such, Commerce may not impose

antidumping duties"); *see also Maquilacero S.A. de C.V. v. United States*, 256 F. Supp. 3d 1294,

1304 (Ct. Int'l Trade 2017).

Similarly, in *Wheatland Tube*, the CAFC found that certain line pipe did not fall under an

antidumping order because "the ITC did not examine the impact of imports of line pipe upon the

domestic industry."  *Wheatland Tube v. United States*, 161 F.3d 1365, 1369, 1371 (Fed. Cir. 1998).

The CAFC explained that "{i}t is possible that the ITC would not have found domestic injury if it

had examined line pipe imports." *Id*. at 1369.  Likewise, this Court reached a similar determination

in *WelCom Products, Inc. v. United States*, 865 F. Supp. 2d 1340 (Ct. Int'l Trade 2012).  Here, the

importer sought a scope ruling that its hand trucks fell outside the scope of the orders, and that the

Commission failed to investigate any "like product."  This Court held that:

> Commerce is bound when making scope determinations to consider
> "the determinations of the ... {International Trade} Commission."
> 19 C.F.R. § 351.225(k)(1).  The court finds the reasoning used to
> deny WelCom's claims that the MCK model was not a like product
> with the hand trucks considered by the ITC in its injury
> determination is speculative and unsupported by substantial
> evidence.  The court is concerned that Commerce has expanded the
> requirements for the utility cart exclusion where evidence exists that
> the ITC did not consider similar products in its investigation.

*WelCom*, 865 F. Supp. 3d at 1347, n.3 (*citing Wheatland Tube*, 161 F.3d at 1370 (expansion of scope to cover line pipe improper where product was not considered by Commission) and *A.L. Patterson, supra*, Slip Op. 12-103 at *14- 15).  The Court noted WelCom's claim that "the ITC investigated products rated for carrying between 200 to 1,200 lbs., whereas the products involved here are rated to carry no more than 150 lbs."  *Id.* at 1348, n.3.  This Court ordered a remand, directing Commerce to:

> {R}econsider its conclusion that the entire telescoping portion of the frame must be less than 5/8" in diameter, and to consider the record developed in the ITC injury determination.  The court instructs Commerce to find whether ITC considered hand trucks similar to the Magna Cart models here were made in the U.S., or were covered by the injury determination.

*WelCom*, 865 F. Supp. 2d at 1348 (emphasis added).  On remand, "Commerce found . . . that 'the ITC did not distinguish between {hand trucks similar to the Magna Cart Models at issue here} and the hand trucks it considered, such that we can determine whether the ITC considered such hand trucks made in the United States.'"  *WelCom Products, Inc v. United States*, 37 C.I.T. 570 (Apr. 24, 2013).  Because Commerce determined on remand that the Commission had not investigated subject hand trucks, and that Commerce had reversed its determination on the diameter requirement respecting the telescoping portion of the frame, the Court entered a judgment in favor of WelCom.

In the Final Scope Determination, Commerce improperly included Scenario 2 under the scope of the *Orders*.  During the injury investigation, the Commission differentiated between re-roll and subject merchandise during its injury determination.  *Common Alloy Aluminum Sheet from China*, USITC Pub. 4861 at I-14 to I-18.  P.R. 43 at Ex. 6; C.R. 12 at Ex. 6.  In the Commission's description of the manufacturing process of subject merchandise, re-roll stock is the coiled aluminum alloy sheet resulting from the melting and refining and casting processes, *before* the

sheet is further manufactured into CAAS products through the flat-rolling process and additional processes, including heat-treating, annealing, and/or finishing.  *Id.*; *see also Common Alloy Aluminum Sheet from China*, USITC Pub. 4757 at I-10 (defining the three distinct stages of manufacturing of subject CAAS as (1) melting and refining aluminum, (2) casting aluminum into semi-finished forms such as sheet ingot, and (3) rolling semi-finished forms into flat-rolled products such as aluminum sheet).  P.R. 43 at Ex. 7; C.R. 12 at Ex. 7. Importantly, the pricing analysis for the Commission's final determination only included H and O tempers, *i.e.*, downstream CAAS products.

Commerce cannot unlawfully expand the scope of the *China CAAS Orders* to include merchandise not considered during the underlying investigation; inclusion of a certain temper product under the scope of the *China CAAS Orders* would constitute such an unlawful expansion. Accordingly, Commerce's expansion of the scope of the *China CAAS Orders* is not in accordance with law.

### G. COMMERCE'S RELIANCE ON A SEPARATE AND DISTINCT ORDER UNLAWFULLY EXPANDED THE SCOPE OF THE *CHINA CAAS ORDERS*

In the Final Scope Determination, Commerce, in part, based its determination on temper on Commerce's findings in a separate investigation and subsequent orders of common alloy aluminum sheet from Bahrain, Brazil, Croatia, Egypt, Germany, Greece, India, Indonesia, Italy, Korea, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan, and Turkey.  Final Scope Determination at 9; *see also Common Alloy Aluminum Sheet from Bahrain, India, and the Republic of Turkey: Countervailing Duty Orders*, 86 Fed. Reg. 22,144 (Apr. 27, 2021); *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22139 (Apr. 27, 2021) (collectively, "*CAAS Orders from 16*

*Countries*"). Commerce's reliance on a separate order for its analysis is contrary to law as the *CAAS Orders from 16 Countries* had separate investigation, interested parties, scope comments and analysis, and injury determinations based on different volume, pricing, and domestic like product analysis. Commerce's use of the *CAAS Orders from 16 Countries* as support for its Final Scope Determination is unlawful as it expands the scope to include merchandise that was not part of the underlying investigation. Indeed, the *CAAS Orders from 16 Countries* would not even be considered proper (k)(1) sources as it was not part of the underlying *China CAAS Orders'* investigation, but rather occurred after the *China CAAS Orders* were put into place.

Accordingly, Commerce's reliance on a different order and the Commission's analysis to support its Final Scope Determination is arbitrary and capricious and otherwise not in accordance with law.

## H. COMMERCE'S FAILURE TO ADDRESS THE SUBSTANTIAL TRANSFORMATION OF SCENARIO 2 IN TURKEY WAS UNLAWFUL

Commerce's *Final Scope Determination* determined that the finished common alloy aluminum sheet further processed in Turkey and exported from Turkey to the United States is subject to the *CAAS China Orders*. Based on the administrative record before Commerce and the underlying investigation of the *CAAS China Orders*, however, continuous cast coil and/or [ ] temper product is non-subject merchandise. As a result, the product at the time of entry into Turkey was non-subject and Commerce should have undertaken a similar analysis as it properly did with respect to Scenario 1. Final Scope Determination at 7-8 ("because the Chinese aluminum sheet input entered Turkey as non-scope merchandise . . ., the common alloy aluminum sheet in Scenario 1 does not satisfy the scope requirements that both the aluminum sheet input produced in China and the common alloy aluminum sheet further processed in a third country and exported to the United States meet the physical characteristics" of the China CAAS Orders").

32

In the alternative, Commerce should have addressed the issues of substantial transformation of the non-subject inputs in Turkey as provided by AA Metals in its Supplemental Questionnaire Response. *See e.g.*, Supplemental Questionnaire Response at 13, 15. P.R. 42; C.R. 11. Commerce's failure to address the substantial transformation analysis as set forth by AA Metals in its Second Supplemental Questionnaire Response is unlawful. AA Metals provided that "{w}hile the merchandise at the time of export from Turkey meets the physical description alone of the *China CAAS Orders*, the product exported from China to Turkey is non-subject merchandise that has undergone substantial transformation such that the merchandise is Turkish origin for duty purposes." Supplemental Questionnaire Response at 13. P.R. 42; C.R. 11. AA Metals provided explanation and documentation on the administrative record demonstrating that the mechanical properties of the final CAAS product occurred following the manufacturing operations in Turkey, *i.e.*, following rolling. Such manufacturing processing is not mere "annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting." Commerce ignored this evidence in its *Final Scope Determination,* failing to even address the issue of substantial transformation prior to finding that CAAS manufactured in Turkey by PMS Metals fell under the scope of the *CAAS China Orders*. As a result, Commerce's *Final Scope Determination* is inconsistent and directly conflicts with its established practices and determinations that hot and cold rolling processes result in a substantial transformation for country- of-origin purposes in antidumping and countervailing duty proceedings.

When determining country of origin for dumping purposes, it is Commerce's practice to conduct a substantial transformation analysis when a product has undergone a fundamental change resulting from manufacturing in a third country. AA Metals provided Commerce with multiple sources to address the substantial transformation rules of the product after entry into Turkey. For

instance, in considering similar products, Commerce has found that the rolling process, both cold and hot, results in a substantial transformation. *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils From the United Kingdom*, 64 Fed. Reg. 30,688, 30,704 (Dep't Commerce June 8, 1999).  P.R. 44 at. Ex. 8; C.R. 13 at Ex. 8.  In assessing substantial transformation concerning cold-rolling a hot-rolled product, Commerce has also determined that cold-rolling a hot-rolled product results in substantial transformation. Specifically, Commerce found that the "cold-rolled coils are distinguished from hot-rolled coils by their reduced thickness, tighter tolerances, better surface quality, and increased hardness which are achieved through cold rolling." *Stainless Steel Sheet and Strip in Coils from Taiwan*, 71 Fed. Reg. 7519 (Dep't Commerce Feb. 13, 2006) and accompanying Issues and Decision Memorandum at Cmt 10, n 27.  P.R. 44 at Ex. 9; C.R. 13 at Ex. 9.  Similarly, Commerce has determined that "steel hot rolled in Germany and not further cold rolled in Belgium" was country of origin from Germany, and consequently "was not subject to the antidumping order." *Ugine & Alz Belg. V. United States*, 551 F.3d 1339, 1345 (Fed. Cir. 2009).

AA Metals also provided Commerce with a number of relevant CBP rulings addressing substantial transformation.  P.R. 42 at 14-15; C.R. 11 at 14-15; P.R. 44 at Exs. 12-18; C.R. 13 at Exs. 12-18.  On the issue of whether rolling results in a substantial transformation, CBP findings and Commerce's are consistent.  While not bound by rulings issued by CBP, Commerce often follows CBP's findings and finds them instructive.  CBP has routinely found that rolling substantially transforms metal products and conferring country of origin.  In making substantial transformation determinations, CBP has relied upon *Ferrostaal Metals* in finding that hot-rolled aluminum coils were substantially transformed by cold-rolling processing.  *Ferrostaal Metals Corp. v United States, 664 F. Supp. 535, 537 (Ct. Int' Trade 1987)*.

34

For example, in Ruling N36839, CBP considered the country of origin of bright aluminum clad sheet. P.R. 44 at Ex. 14; C.R. 13 at Ex. 14. As discussed in AA Metals' supplemental questionnaire, the sheet ranged in thickness from 0.01 millimeters ("mm") to 1.0 mm and was imported in 1250 wide coils. P.R. 42 at 8-9; C.R. 11. at 8-9. The surface of the aluminum sheeting was anodized and may have had either a lacquer finish, a physical vapor disposition ("PVD") finish or both. The bright aluminum clad sheet consisted of two layers: (1) a core layer and (2) a cladding layer. The slabs for the core layer were manufactured in Austria. The sheet was produced through a multi-step, multi country manufacturing process. The first step was melting and casting. Melting and casting of the core layer was performed in various countries, while the melting and casting of the cladding layer was performed in Austria. The second step was plate rolling, which consisted of a roll bonding process during which the core layer and the cladding layer were passed through a pair of flat rollers and were metallurgically bonded together. In the third step, the sheet was etched for cleaning before bright cold-rolling reduction. The next step consisted of cold-rolling reduction, which "is a thermos-mechanical process that alters the microstructure of the aluminum and also reduces the thickness by as much as 30 percent." Then, if the sheet was to be annealed, it happened after the bright cold-rolling reduction phase and before the sheet was exported to Germany. In Germany, the sheet was anodized, and, when applicable, a PVD finish was applied, and the sheet was lacquered. The sheet was then imported into the U.S. as a bright aluminum clad sheet. CBP found "that a substantial transformation occurred with the cold-rolling performed in Austria" (emphasis added). Therefore, the imported aluminum sheet was a product of Austria for marking and duty purposes.

Despite the robust administrative record demonstrating substantial transformation and Commerce's own precedent finding that rolling constitutes a substantial transformation and

confers origin Commerce failed to consider or address this issue in its Final Scope Determination. Failure to consider this record evidence and address the issue of substantial transformation renders Commerce's Final Scope Determination unsupported by substantial evidence and arbitrary and capricious. In *Agilent Technologies v. United States*, petitioner challenged a Commerce scope determination that found that a mass filter radiator ("MFR") did not qualify for the heat sink exclusion from the antidumping and countervailing duty orders on aluminum extrusions. *Agilent Technologies v. United States*, 256 F. Supp. 3d 1338 (2017) . In reaching this decision, Commerce ignored evidence and explanation on the record that the "primary function of the MFR is to transfer heat from the heat source to the quadrupole" and a declaration from the company's Research and Development Project Manager indicating that the MFR acts as a finished heat sink and providing relevant details. *Id*. at 1341. When Commerce found inquiry merchandise subject to the orders, the Court concluded that "Commerce's cursory explanation, {a single conclusory paragraph}, failed to address the considerable amount of record evidence submitted by Agilent to show that the MFR was designed and tested around specific thermal performance requirements." *Id*. at 1345. Accordingly, the Court concluded that Commerce's scope ruling did not adequately discuss the record evidence and as a result, Commerce's determination was unsupported by substantial evidence. *Id*.

The same reasoning applies here. The administrative record provides information related to the significant manufacturing that the Scenario 2 product underwent in Turkey, including rolling, which imparted the mechanical properties of the final CAAS product that was imported into the United States. As outlined in the initial questionnaire:

> The cast coils are unwrought primary aluminum with very brittle cast microstructure and must be further manufactured to become wrought aluminum before being used. The manufacturing

> operations at PMS changed the unwrought cast coils to wrought
> aluminum coils after {an} [    ] percent thickness reduction.

Initial Questionnaire at 7.  P.R. 20; C.R. 1. A comparison of Exhibit 6 and Exhibit 8 of AA Metals' initial questionnaire supports this factual statement, showing that the Scenario 2 product, after entry into Turkey was substantially transformed from a [  ] temper product to a [   ] temper product.  *Id*. at Exhibit 6, Exhibit 8.  P.R. 22, 23; C.R. 3, 4.  As shown by AA Metals' submissions, PMS rolled and otherwise processed the coil after entry into Turkey, which imparted the mechanical properties of the finished CAAS product, thus transforming the coils into Turkish originating CAAS.  Failure to consider the substantial transformation that resulted from Turkish processing and to address this record information renders Commerce's *Final Scope Determination* unsupported by substantial evidence and is otherwise not in accordance with law.

## V.   CONCLUSION

For the reasons set forth in this brief, AA Metals respectfully requests this Court hold that Commerce's Final Scope Determination was not supported by substantial evidence and is otherwise not in accordance with law.  AA Metals respectfully requests the Court to remand this matter to Commerce with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully Submitted,

/s/ Kristen S. Smith
Kristen S. Smith
Sarah E. Yuskaitis

**SANDLER TRAVIS & ROSENBERG, P.A.**
1300 Pennsylvania Avenue, N.W.
Suite 400
Washington, D.C. 20004
Tel: (202) 730-4965
Fax: (202) 842-2247

*Attorneys for AA Metals, Inc.*

Dated: July 22, 2022

## Certificate of Compliance with Chamber Procedure 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 11,386 words, inclusive of footnotes, exclusive of the table of contents, table of authorities, and certificates of counsel, and counsel's signature block, and therefore complies with the maximum 14,000-word count limitation set forth in the Standard Chamber Procedures of the U.S. Court of International Trade.

By:   /s/ Sarah E. Yuskaitis
      *Counsel for AA Metals, Inc.*

Dated: July 22, 2022