IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE

| | |
|---|---|
| AA METALS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>TEXARKANA ALUMINUM, INC.,<br><br>*Defendant-Intervenor*. | PUBLIC DOCUMENT<br><br>Court No. 22-00051 |

**DEFENDANT-INTERVENOR'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Jeremy W. Dutra
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
jeremy.dutra@squirepb.com

*Counsel for Defendant-Intervenor Texarkana Aluminum, Inc.*

Dated: November 3, 2022

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................ ii

WORD COUNT CERTIFICATE OF COMPLIANCE ........................................................ iii

I. RULE 56.2 STATEMENT ........................................................ 1

A. Administrative Determination Sought to Be Reviewed ........................................................ 1

B. Issues Presented and Summary of the Argument ........................................................ 1

II. ARGUMENT ........................................................ 1

A. The administrative record confirms that the aluminum sheet exported from China to Turkey in Scenario 2 is within the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet from China ............ 2

B. Commerce was not required to conduct a substantial transformation analysis. ........................................................ 6

III. CONCLUSION ........................................................ 7

# TABLE OF AUTHORITIES

## Cases

*King Supply Co. v. United States*, 674 F.3d 1343 (Fed. Cir. 2012)....................2
*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295 (Fed. Cir. 2013)....................3
*Whirlpool Co. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018)....................3, 5

## Regulations

19 C.F.R. § 351.225(k)(1)....................3

## Administrative Materials

*Common Alloy Aluminum Sheet From China: Antidumping Duty Order*, 84 Fed. Reg. 2813 (Dep't of Commerce Feb. 8, 2019)....................3, 5, 6

*Common Alloy Aluminum Sheet From China: Countervailing Duty Order*, 84 Fed. Reg. 2157 (Dep't of Commerce Feb. 6, 2019)....................3, 5, 6

**WORD COUNT CERTIFICATE OF COMPLIANCE**

This brief has been prepared utilizing Microsoft Word with 12-point Times New Roman font. In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in 2B(1) of the Chambers Procedures, undersigned certifies that this brief contains 1,881 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

Dated: November 3, 2022

Respectfully submitted,

*/s/ Jeremy W. Dutra*
Jeremy W. Dutra

*Counsel for Defendant-Intervenor*
*Texarkana Aluminum, Inc.*

Defendant-Intervenor Texarkana Aluminum, Inc. ("TKA") submits this response in opposition to the motion for judgment on the agency record filed by Plaintiff AA Metals, Inc. ("AA Metals"). Pl. AA Metals, Inc.'s Mem. of P&A's in Supp. of Its Rule 56.2 Mot. for J. on the Agency Record (July 22, 2022), ECF No. 22-1 ("Plaintiff's Brief").

## I. RULE 56.2 STATEMENT

### A. Administrative Determination Sought to Be Reviewed

The administrative determination under review is *Antidumping and Countervailing Duty Orders on Common Alloy Aluminum Sheet from the People's Republic of China, Enforcement and Protect Act Investigation No. 7469: Notification of Final Scope Determination and Response to Covered Merchandise Referral* (Dep't of Commerce Jan. 21, 2022) ("Final Scope Determination") (P.R. 48).

### B. Issues Presented and Summary of the Argument

1. Whether Commerce correctly interpreted the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet to cover aluminum sheet exported from China to Turkey for further processing.

2. Whether Commerce was required to perform a substantial transformation analysis to determine whether the country of origin for aluminum sheet exported from China to Turkey for further processing.

## II. ARGUMENT

Contrary to Plaintiff's claims, Commerce correctly interpreted the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet from China in confirming that the China-origin aluminum coils are included in the scope. (P.R. 48 at 8-9.) Plaintiff provided the Court with no grounds on which to overturn Commerce's decision, particularly given the applicable standard of review in appeals of the agency's scope rulings. *See*

*King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (noting that, in reviewing scope rulings, the court must give Commerce "substantial deference with regard to its interpretation of its own {AD} orders," which are "particularly within the expertise and special competence of Commerce") (citations and quotations omitted).

**A. The administrative record confirms that the aluminum sheet exported from China to Turkey in Scenario 2 is within the scope of the antidumping and countervailing duty orders on common alloy aluminum sheet from China.**

Any scope analysis must begin with the scope language in the *Orders*. 19 C.F.R. § 351.225(k)(1). "If the scope is unambiguous, the plain meaning of the Orders' language governs." *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018); *see also* 19 C.F.R. § 351.225(k)(1). Only "{i}f the language is ambiguous," must Commerce "consider the regulatory history, as contained in the so-called (k)(1) materials." *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013).

The Orders here cover:

> {a}luminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-to-length, regardless of width.
>
> Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy as designated by the Aluminum Association. With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.
>
> Common alloy sheet may be made to ASTM specification B209–14, but can also be made to other specifications. Regardless of specification, however, all common alloy sheet meeting the scope description is included in the scope.

*Common Alloy Aluminum Sheet From China: Antidumping Duty Order*, 84 Fed. Reg. 2813, 2815 (Dep't of Commerce Feb. 8, 2019) ("AD Ordeer"); *Common Alloy Aluminum Sheet From China:*

*Countervailing Duty Order*, 84 Fed. Reg. 2157, 2158 (Dep't of Commerce Feb. 6, 2019) ("CVD Order") (collectively, the "Orders").

Commerce found that AA Metals' initial questionnaire response confirmed that the aluminum product exported from China to Turkey in Scenario 2 had a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils, or cut to length, regardless of width. (P.R. 48 at 9 (citing Initial Response at Ex. 6 (P.R. 43).) AA Metals does not—and cannot—dispute this finding as to the physical dimensions of the product.

Commerce further found that AA Metals' initial questionnaire response confirmed that the aluminum product exported from China to Turkey in Scenario 2 is identified with a four-digit designation, which indicates that the product is a flat-rolled aluminum sheet, not a continuous cast coil that AA Metals contends "is unwrought aluminum manufactured by casting without further hot or cold rolling." (P.R. 48 at 9 (citing Initial Response at Ex. 6; *see also* P.R. 4, Narrative at 17.)

Commerce detailed why it determined the Chinese-origin product is "flat-rolled aluminum sheet" instead of "continuous cast coil and unwrought aluminum manufactured by casting" as AA Metals asserted. (P.R. 48 at 8.) According to record evidence AA Metals submitted, "{a}luminum alloy castings are designated with three digits and the decimal digit zero, which indicates castings (xxx.0)." (*Id.*; *see also* P.R. 45, Ex. 19, Appendix A at 10A-1, 10A-3, 10A-4; P.R. 42, Ex. 4 at Tables 2.) By contrast, the record shows that "wrought aluminum alloy products are designated with four digits with no decimal digit (xxxx)." (P.R. 48 at 8; P.R. 45, Ex. 19, Appendix A at 10A-1; P.R. 42, Ex. 4 at Tables 1.) AA Metals tried arguing to Commerce that both unwrought and wrought aluminum are identified by a four-digit designation system. (P.R. 42, Narrative at 19.) But, as Commerce explained, the evidence AA Metals cites covers only *wrought* aluminum, not



1094727274\1\AMERICAS

*unwrought* aluminum. (P.R. 48 at 8; P.R. 45, *compare* Ex. 19, Appendix A at 10A-1 *with id.* at 10A-3, 10A-4; P.R. 42, Ex. 4 at Tables 1; P.R. 46, Ex. 21.)

None of the purchase documents AA Metals submitted indicate that the aluminum coil exported from China to Turkey in Scenario 2 was unrolled continuous cast coil that is unwrought aluminum. (P.R. 48 at 8-9; C.R. 3, Ex. 6.)

AA Metals argues now that Commerce was supposed to credit AA Metals' characterization of the Scenario 2 product "as a continuous case product" because they were made "truthfully and supported by signed factual certifications of their accuracy pursuant to 19 C.F.R. § 351.303(g)(2)." Plaintiff's Brief at 20. But Commerce was not obligated to credit AA Metal's assertion when that assertion is not supported by, and indeed, contradicted by the record evidence AA Metals submitted. (P.R. 48 at 8-9.) Nor was Commerce compelled to blindly accept AA Metals' characterization about the Scenario 2 product given AA Metals conceded that it is "in no way related" to PMS and thus "cannot provide information related to PMS' business or operations" or "PMS' entry documentation related to its Turkish imports." (P.R. 20, Narrative at 1-2.)

AA Metals further challenges Commerce's determination by arguing that the Final Scope Determination "was the first notification to AA Metals that Commerce did not deem the product set forth in Scenario 2 to be "continuous cast coil." Plaintiff's Brief at 17. The argument is without merit. Commerce issued a Supplemental Questionnaire to AA Metals, and Question 2 leaves no doubt that Commerce questioned AA Metals' characterization of the Scenario 2 product in its Initial Questionnaire response. (P.R. 38.) Referencing AA Metals' characterization of the Scenario 2 product as "continuous cast coil, Commerce noted its concerns: (1) the "continuous cast coil in Scenario 2 appears to meet the physical description of the scope of the orders because the thickness is within the scope . . . and because this thickness indicates that it is in the form of

aluminum sheet, not ingots, blocks, billets, slabs and similar manufactured forms," (2) the chemical composition of the continuous cast coil in Scenario 2 . . . indicates that it is alloyed aluminum sheet." (*Id.*) Commerce asked a series of pointed questions, thus providing AA Metals the opportunity to demonstrate that the Scenario 2 product is continuous cast coil (*i.e.*, unwrought aluminum that has not been rolled) instead of aluminum sheet. (*Id.*) AA Metals, as Commerce indicated in its determination, failed to provide evidence supporting its assertion about the nature of the Scenario 2 product. (P.R. 48 at 8-9.)

AA Metals next contends that Commerce "unlawfully expands" the scope of the Orders by including tempers not considered as subject merchandise in the underlying investigation. Plaintiff's Brief at 23-28. AA Metals' argument, again, is without merit. "Although Commerce has the authority to clarify an order's scope, it cannot interpret an order "in a way contrary to its terms." *Whirlpool*, 890 F.3d at 1308. But that is precisely what AA Metals seeks to accomplish.

Here, the Order expressly includes in the scope "all common alloy sheet meeting the scope description." AD Order, 84 Fed. Reg. 2813 at 2815; CVD Order, 84 Fed. Reg. 2157 at 2158. The Orders include a single exclusion for aluminum can stock meeting certain characteristics:

> Excluded from the scope of this order is aluminum can stock, which is suitable for use in the manufacture of aluminum beverage cans, lids of such cans, or tabs used to open such cans. Aluminum can stock is produced to gauges that range from 0.200 mm to 0.292 mm, and has an H-19, H-41, H-48, or H-391 temper. In addition, aluminum can stock has a lubricant applied to the flat surfaces of the can stock to facilitate its movement through machines used in the manufacture of beverage cans.

AD Order, 84 Fed. Reg. 2813 at 2815; CVD Order, 84 Fed. Reg. 2157 at 2158-59.

The Scenario 2 product is common alloy sheet meeting the scope description and does not meet the description of the exclusion. As such, the product is covered by the scope of the Orders as Commerce determined.

**B. Commerce was not required to conduct a substantial transformation analysis.**

AA Metals challenges the Final Scope Determination as unlawful because the processes performed in Turkey "substantially transformed the Chinese-origin aluminum product of Scenario 2 such that it should be treated as a product of Turkey, not China. Plaintiff's Brief at 34-37. The case law AA Metals cites, however, is inapposite because the Orders specifically address third-party processing:

> Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the common alloy sheet.

AD Order, 84 Fed. Reg. 2813 at 2815; CVD Order, 84 Fed. Reg. 2157 at 2158.

The "the aluminum sheet input produced in China {in Scenario 2} and the finished common alloy aluminum sheet further processed in Turkey and exported from Turkey to the United States meet the physical characteristics of the scope of the Orders." (P.R. 48 at 9.) Because the product was in scope when it was exported to Turkey from China and remained in scope after processing in Turkey, a substantial transformation analysis was not required.

**CONCLUSION**

For the forgoing reasons, and for the reasons articulated by the United States in its Response to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record (ECF No. 27), TKA respectfully requests that the Court deny AA Metals' motion for judgment, sustain Commerce's final scope determination, and enter judgment for the United States.

Dated: November 3, 2022

Respectfully submitted,

*/s/ Jeremy W. Dutra*

Jeremy W. Dutra
SQUIRE PATTON BOGGS (US) LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
jeremy.dutra@squirepb.com

*Counsel for Defendant-Intervenor Texarkana Aluminum, Inc.*