## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE THE HONORABLE JANE A. RESTANI, SENIOR JUDGE**

AA METALS, INC.

                *Plaintiff,*

   v.

UNITED STATES,

                *Defendant,*

   and

TEXARKANA ALUMINUM, INC,

          *Defendant-Intervenor.*

Court No. 22-00051

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information
Removed from Pages i, 2-7, and 15-17**

## PLAINTIFF AA METALS, INC.'S REPLY BRIEF

Kristen Smith
Sarah E. Yuskaitis
**Sandler Travis & Rosenberg, P.A.**
1300 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20004
Tel: (202) 730-4965

*Counsel for AA Metals, Inc.*

Dated: December 1, 2022

NON-CONFIDENTIAL VERSION

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT ............................................................................................................. 1

   A.   [  ] Temper Products Do Not Meet the Physical Characteristics of Subject Merchandise to be Deemed a Subject CAAS Product .................................................................. 2

   B.   Commerce's Reliance on the *CAAS Orders from 16 Countries* was Unlawful .................. 7

   C.   Commerce Failed to Conduct a Proper (k)(1) Analysis ...................................... 9

   D.   Commerce Cannot Play a Game of "Gotcha" ................................................. 10

   E.   Commerce Should Have Conducted a Substantial Transformation Analysis .................. 13

III.  CONCLUSION ........................................................................................................ 17

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

AK Steel Corporation v. United States, 22 CIT 1070, 34 F.Supp.2d 756 (1998) ....................... 13

*Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ................... 4, 5

*Arcelormittal Stainless Belg. N.V. v. United States*, No. 08-00434, Slip Op. 11-82, 2011 Ct. Int'l
   Trade LEXIS 82, at 28 n.8 (Ct. Int'l Trade July 12, 2011) ........................................................ 4

*Belgium v. United States*, 551 F.3d 1339 (Fed. Cir. 2009) ........................................................... 9

*Böwe–Passat v. United States*, 17 CIT 335 (1993) ..................................................................... 13

*Cablesa S.A. de C.V. v. United States*, 31 CIT 252, 260 (2007) .................................................... 4

*Canadian Solar Inc. v. United States*, 918 F.3d 909 (Fed. Cir 2019) .......................................... 16

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Jul. 12, 2022) ......................................... 8, 9


**<u>Statutes and Regulations</u>**

19 C.F.R. § 351.225(k)(1) ..................................................................................................... 7, 9, 10

19 C.F.R. § 351.225(k)(2) ................................................................................................................ 4

**<u>Administrative Decisions</u>**

*Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India,
   Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the
   Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22,139 (Apr. 27, 2021) .............. 8

*Common Alloy Aluminum Sheet from Bahrain, India, and the Republic of Turkey: Countervailing
   Duty Orders*, 86 Fed. Reg. 22,144 (Apr. 27, 2021) ................................................................. 8

*Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*,
   84 Fed. Reg. 2,813, 2,815, 2019 WL 482272 (Feb. 8, 2019) ........................................... 3, 4, 14

*Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty
   Order*, 84 Fed. Reg. 2,157, 2,158, 2019 WL 447442 (Int'l Trade Admin. Feb. 6, 2019)  3, 4, 14

Memorandum from Dana S. Mermelstein, Director, Office VI, Antidumping and Countervailing
   Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and
   Countervailing Duty Operations, *Subject: Antidumping and Countervailing Duty Orders on
   Common Alloy Aluminum Sheet from the People's Republic of China, Enforcement and*

*Protect Act Investigation No. 7469: Notification of the Final Scope Determination and Response to Covered Merchandise Referral* (Jan. 21, 2022) ...................................................... 1

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from the United Kingdom*, 64 Fed. Reg. 30,699, 30,704 (Dep't Commerce June 8, 1999)................................................................................................................................... 16

*Stainless Steel Sheet and Strip in Coils from Taiwan*, 71 Fed. Reg. 7519 (Dep't Commerce Feb. 13, 2006) and accompanying Issues and Decision Memorandum ........................................... 16

## I.   INTRODUCTION

Plaintiff AA Metals, Inc. ("AA Metals" or "Plaintiff") respectfully submits the following brief in reply to response briefs from Defendant United States (the "Government"), ECF No. 26 ("Def. Br."), and Defendant-Intervenor, Texarkana Aluminum Inc. ("Defendant-Intervenor"), ECF 28 ("Def.-Int. Br.").

## II.   ARGUMENT

As explained in detail in AA Metals' opening brief, the U.S. Department of Commerce's ("Commerce") final scope determination is not supported by substantial evidence and is otherwise not in accordance with law.  *See* Memorandum from Dana S. Mermelstein, Director, Office VI, Antidumping and Countervailing Duty Operations, to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, *Subject: Antidumping and Countervailing Duty Orders on Common Alloy Aluminum Sheet from the People's Republic of China, Enforcement and Protect Act Investigation No. 7469: Notification of the Final Scope Determination and Response to Covered Merchandise Referral* (Jan. 21, 2022) ("Final Scope Determination").  P.R. 48.

Commerce's Final Scope Determination is unlawful.  Commerce ignored its regulatory framework for scope determinations.  Defendant and Defendant-Intervenor failed to address the determinations challenged by Plaintiff in any meaningful way, often ignoring or misconstruing the issues before the Court.  In simply reiterating the rationale of the Final Scope Determination, the arguments presented by Defendant and Defendant-Intervenor should be dismissed for the reasons discussed in AA Metals' brief, ECF No. 21 ("Pl. Br"), and in further detail below.

### A. [ ] Temper Products Do Not Meet the Physical Characteristics of Subject Merchandise to be Deemed a Subject CAAS Product

Defendant continues to advance the same flawed analysis from Commerce's Final Scope Determination in asserting that [ ] temper products are subject to the *China CAAS Orders* by first asserting that "distinctions {in mechanical properties} appear nowhere in the Orders." Def. Br. at 15-16. However, Defendant misconstrues AA Metals' arguments on the discussion of mechanical properties and demonstrates a fundamental misunderstanding of the merchandise subject to the *China CAAS Orders*. Defendant appears to argue that [ ] temper is a common alloy sheet without pointing to any administrative evidence to support such an assertion and ignores the basic principle that mechanical properties are physical properties that a material exhibits upon the application of forces. Def. Br. at 15-16; *see also* Letter from Sandler, Travis & Rosenberg, P.A. to Dep't of Commerce, *Re: Common Alloy Aluminum Sheet from the People's Republic of China: AA Metals Inc. and Teknik Aluminyum Sanayi A.S. – Supplemental Questionnaire* (Nov. 5, 2021) ("Supplemental Questionnaire Response") at Exhibit 4 ("temper designations are alphanumeric designations appended to the alloy designations that convey to the producer and user alike information about the general manner in which the alloy has been mechanically and/or thermally treated to achieve the properties desired."). P.R. 42; C.R. 11.

Determining whether [ ] temper products are subject to the *China CAAS Orders* hinges on the definition of "common alloy," which the administrative record demonstrates is defined by a product's mechanical properties. Both Defendant and Commerce failed to address this fact. Here, what is considered "common alloy sheet" and therefore deemed subject merchandise is at issue. As set forth in the first sentence of the *China CAAS Orders*, "{t}he merchandise covered by this order is aluminum **common alloy** sheet (**common alloy** sheet), which is a flat-rolled aluminum product having a thickness of 6.3 mm or less, but greater than 0.2 mm, in coils or cut-

to-length, regardless of width." *See Common Alloy Aluminum Sheet From the People's Republic of China: Antidumping Duty Order*, 84 Fed. Reg. 2,813, 2,815, 2019 WL 482272 (Feb. 8, 2019); *Common Alloy Aluminum Sheet From the People's Republic of China: Countervailing Duty Order*, 84 Fed. Reg. 2,157, 2,158, 2019 WL 447442 (Int'l Trade Admin. Feb. 6, 2019) (collectively, "*China CAAS Orders*"). As the mechanical properties are critical to temper designations, such consideration is important to establish whether the mechanical properties equate to subject merchandise (*i.e.*, whether the mechanical properties of a product render the product "common alloy"). *See e.g.*, Supplemental Questionnaire Response at 3 (citing Exhibit 7). P.R. 42, 43; C.R. 11, 12 ("[


].");  Pl. Br. at 26-27, citing Supplemental Questionnaire Response at 4-5. P.R. 42; C.R. 11 ("In the Commission's description of the manufacturing process of subject merchandise, re-roll stock, *i.e.*, [ ] temper, is the coiled aluminum alloy sheet resulting from the melting and refining and casting processes, *before* the sheet is further manufactured into CAAS products through the flat-rolling process and additional processes, including heat-treating, annealing, and/or finishing."). The administrative record demonstrates that there are defining differences between subject merchandise and [ ] temper products such that even the Aluminum Association standards do not have specific limits on mechanical properties for [ ] temper products. *See* Supplemental Questionnaire Response at 3. P.R. 42; C.R. 11. If a product, such as [ ] temper in this instance, is not yet a "common alloy," *i.e.*, CAAS product, as it does not meet the physical properties to be a CAAS product, then the scope is inapplicable at first instance.

Second, Defendant demonstrates a misunderstanding of Commerce's regulatory framework and the plain language of the *China CAAS Orders* by confusing the issue of "trade

usage" and "industry custom" with the applicable Aluminum Association standards as a way to discredit AA Metals' discussions concerning these standards. Def. Br. at 16. Defendant submits that "Commerce cannot consider (k)(2) factors . . . when, as in this case, Commerce determines that the plain language is dispositive." *Id*. at 16. Here, Defendant mistakes the Aluminum Association standards that Commerce utilizes for purposes of the *China CAAS Orders* with mere "trade usage" as set forth in Commerce's regulation 19 C.F.R. § 351.225(k)(2).

Contrary to Defendant's assertions that this is an issue of (k)(2) factors, the issue at hand is not for (k)(2) analysis and such argument fails both factually and legally. The Aluminum Association standards are the foundation of the scope language in the *China CAAS Orders*, prevalent throughout the underlying investigation in establishing the scope and reporting requirements for mandatory respondents to calculate the AD/CVD margins, and expressly discussed in the scope proceeding before Commerce in this matter. Indeed, these standards are set forth in the plain language of the *China CAAS Orders*. *See China CAAS Orders* at 84 Fed. Reg. at 2,815, 2,158 ("Common alloy sheet within the scope of this order includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet. With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX-, or 5XXX-series alloy **as designated by the Aluminum Association**."). The Federal Circuit has found that Commerce must place the literal language of an order in its proper context. *See e.g.*, *Arcelormittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012) ("[c]ourts have long recognized the importance of considering context, including industry custom, in interpreting written language") (citing *Arcelormittal Stainless Belg. N.V. v. United States*, No. 08-00434, Slip Op. 11-82, 2011 Ct. Int'l Trade LEXIS 82, at 28 n.8 (Ct. Int'l Trade July 12, 2011)); *Cablesa S.A. de C.V. v. United States*, 31 CIT 252, 260 (2007) (affirming Commerce's determination that the scope

should be based on industry standards rather than a dictionary definition).   Here, Commerce itself, in defining the scope of the *China CAAS Orders*, emphasized "{'}the importance of considering context, including industry custom, in interpreting written language'" by specifically referencing the applicable industry standards within the scope language.   *See Arcelormittal Stainless Belg.,* 694 F.3d at 88.   To disregard the Aluminum Association standards in determining what is subject merchandise and what is non-subject merchandise would be inconsistent with the plain language of the *China CAAS Orders*.

Third, Commerce and the Defendant failed to properly apply the statutory criteria in the Final Scope Determination.   Defendant argues that "{b}ecause the Orders apply to 'all common alloy sheet meeting the scope description' and only reference four specific tempers in the aluminum can stock exclusion (H-19, H-41, H-48, and H-391), Commerce determined that the Orders provide no other temper-based exclusions."   Def. Br. at 16.   Defendant, in echoing Commerce's final determination, once again puts the proverbial cart before the horse.   By failing to determine whether Scenario 2 product is "common alloy" consistent with the scope of the *China CAAS Orders*, Commerce's determination that "all common alloy sheet meeting the scope description" is premature.   *Id*. (citing P.R. 48 at 9).   In the Final Scope Determination, Commerce determined that [  ] temper product was common alloy sheet meeting the scope description without any explanation or analysis as to how the Scenario 2 product met the scope requirements of "common alloy aluminum sheet" or defining "common alloy."   By ignoring the Aluminum Association standards, Defendant distorts the fact that [  ] temper products are upstream products that require further processing to be deemed a downstream subject CAAS product.

Defendant's emphasis on the aluminum can stock exclusion is also misplaced. Defendant repeatedly restates Commerce's position that "Commerce explained that the Orders exclude only four specific temper standards (H-19, H-41, H-48, and H-391) in the aluminum can stock exclusion, but provide no 'additional exclusion based on temper standard or temper-specific product description.'" Def. Br. at 15 (citing P.R. 48 at 9); *id.* at 8-9, 16; *see also* Def.-Int. Br. at 5. As noted in AA Metals' opening brief, this exclusion language for aluminum can stock on its face does not impact product that would otherwise be deemed non-subject as the product does not have the physical properties required to meet the scope language. Pl. Br. at 24. There was never a question that H tempered products were deemed subject merchandise based on the mechanical properties of the CAAS product and its inclusion at the time of initiation. Aluminum can stock, having a H-19, H-41, H-48, or H-391 temper, would have been deemed subject merchandise but-for the specific exclusion set forth in the scope language. This exclusion language has no impact on the fact that [ ] temper products do not have the mechanical properties of subject merchandise as an upstream, unfinished product.

In its response brief, Defendant fails to address this critical question of when a product is in fact a CAAS product. Evidence of record confirms that there is a difference between the H temper products that would otherwise be deemed subject but for this exclusion as a finished, downstream CAAS product as compared to the upstream, [ ] temper product. As referenced in the plain language of the scope, the Aluminum Association sets standards for CAAS products. The Aluminum Association identifies various aluminum products by specifying both an alloy and a temper for that product. *See* Supplemental Questionnaire Response at Exhibit 6, I-13, fn 37. P.R. 43; C.R. 12. [

].  *Id*. at 3 (citing Exhibit 7).  P.R. 42, 43; C.R. 11, 12; *see also id*. at 13 (detailing Scenario 2 product).  P.R. 42; C.R. 11.  [

].  *Id*. at 3. This absence of an industry standard for the mechanical properties of [ ] temper confirms the dividing line between [ ] temper and downstream subject CAAS products.  Subject "CAAS derives its strength and formability through specific processing steps consisting of strain hardening obtained by cold-rolling to lower gauges, inter-annealing and stabilize annealing.  By contrast, [        ] products are semi-finished products that will be used for subsequent shaping, finishing or thermal processing to create other finished forms."  *Id*. at 3-4.  In other words, the Aluminum Association does not identify [ ] temper products as a CAAS product within their own standards.

**B. Commerce's Reliance on the *CAAS Orders from 16 Countries* was Unlawful**

Defendant acknowledges that Commerce utilized a 19 C.F.R. § 351.225(k)(1) source in its determination, despite Commerce's claim that it did not conduct a (k)(1) analysis.  Def. Br. at 17; *but see* P.R. 48 at 10.  Defendant provides that "{i}ndeed, Commerce considered the {separate, multi-country antidumping duty and countervailing duty investigations of common alloy aluminum sheet} final decision memorandum for its interpretation of similar scope language, not for the underlying factual information developed in that investigation."  Def. Br. at 17 (citing P.R. 48 at 8-9); *but see* Final Scope Determination, P.R. 48 at 10 ("the plain scope language is dispositive with regard to the product described in Scenario 2, further analysis of the factors listed in 19 CFR 351.225(k)(1) is unnecessary.").  Defendant's arguments are factually and legally deficient.

Defendant is incorrect in asserting that Commerce considered this memorandum for "its interpretation of similar scope language," misconstruing the decision in question.  *Id*.  The *CAAS*

*Orders from 16 Countries* went to order over two years *after* the *China CAAS Orders* were issued. *Common Alloy Aluminum Sheet from Bahrain, India, and the Republic of Turkey: Countervailing Duty Orders*, 86 Fed. Reg. 22,144 (Apr. 27, 2021); *Common Alloy Aluminum Sheet from Bahrain, Brazil, Croatia, Egypt, Germany, India, Indonesia, Italy, Oman, Romania, Serbia, Slovenia, South Africa, Spain, Taiwan and the Republic of Turkey: Antidumping Duty Orders*, 86 Fed. Reg. 22,139 (Apr. 27, 2021) (collectively, "*CAAS Orders from 16 Countries*"). The final memorandum cited by Commerce and now Defendant was not an "*interpretation*" of the scope language of the *CAAS Orders from 16 Countries*. Rather, this memorandum **established** the scope of the *CAAS Orders from 16 Countries* following a separate and distinct investigation in which Commerce determined which merchandise should be included in the *CAAS Orders from 16 Countries.* As the Court of Appeals for the Federal Circuit has provided, "{a} purpose of the investigation is to determine what merchandise should be included in the final order. Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order." *Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Jul. 12, 2022). Commerce solely relied on this final determination despite the fact that this decision was the result of a different petitioner, separate investigation, interested parties, scope comments and analysis, and injury determinations based on different volume, pricing, and domestic like product analysis.

Scope ruling determinations answer the question whether a particular product was originally intended to be included within the scope of the order. After the *CAAS Orders from 16 Countries* were issued, Commerce cannot now rewrite its interpretation of the *China CAAS Orders* contrary to the underlying investigation simply because a later investigation focused on different countries, petitioners, and respondents established broader orders. The Court of

Appeals for the Federal Circuit has emphasized that "Commerce's order must be enforced based on what the order actually says, not on what Commerce wished the order had said." *Belgium v. United States*, 551 F.3d 1339, 1348 (Fed. Cir. 2009) (*citing Duferco,* 296 F.3d at 1097-98). This is particularly important with respect to the *China CAAS Orders* as Commerce was responsible for self-initiating the China CAAS investigations, meaning that Commerce established the scope at first instance, crafting the scope proposed at the time of initiation for the entirety of the underlying investigation.

Despite Commerce's consideration of the separate *CAAS Orders from 16 Countries* determination, Commerce refused to consider any other (k)(1) sources, rejecting a substantial administrative record before it in this proceeding. Commerce unlawfully refused to consider substantial evidence submitted by AA Metals from the original investigation, including the descriptions of the merchandise contained in the petition, the initial investigation, and the Commission's injury determinations that certain tempers were not subject to the underlying investigation. *See* Supplemental Questionnaire Response at 3-4, 13, Exhibit 5, and Exhibit 6. P.R. 42, 43; C.R. 11, 12.

### C.  Commerce Failed to Conduct a Proper (k)(1) Analysis

Even assuming *in arguendo* that Commerce's reliance on separate, multi-country antidumping duty and countervailing duty investigations of common alloy aluminum sheet was proper, Commerce's Final Scope Determination would amount to an incomplete (k)(1) analysis, as the Final Scope Determination focused solely on a separate investigation and different administrative record while Commerce refused to address the administrative record from the underlying investigation, which included descriptions of the merchandise contained in Commerce's initiation, the initial investigation, and the determinations of Commerce and the International Trade Commission. 19 C.F.R. § 351.225(k)(1). If Commerce was, in fact,

undertaking a (k)(1) analysis as Defendant acknowledges, then Commerce must follow the framework of (k)(1). Here, Commerce failed to properly conduct a (k)(1) analysis.

Defendant's case brief and Commerce's Final Scope Determination inconsistently address the (k)(1) framework. Defendant provides that "Commerce's determination in this case reflects consideration of (k)(1) material." Def. Br. at 18. And yet, the Final Scope Determination is devoid of any analysis reflecting a proper consideration of these (k)(1) sources. The Final Scope Determination states "the plain scope language is dispositive with regard to the product described in Scenario 2, further analysis of the factors listed in 19 CFR 351.225(k)(1) is unnecessary." P.R. 48 at 10. The Final Scope Determination offered no explanation or justification for ignoring all other record evidence provided by AA Metals from the underlying investigation at Commerce and the International Trade Commission. Defendant furthered no explanation or argument for Commerce's decision to state that a (k)(1) analysis was not necessary while also relying on a singular piece of "(k)(1) material." Nor does Defendant address the substantial (k)(1) evidence placed before Commerce from the underlying investigation that supports AA Metals' position. As a result, Commerce's failure to analyze factors set forth in 19 C.F.R. § 351.225(k)(1) and ignoring the administrative record when considering whether the scope of the *China CAAS Orders* includes Scenario 2 merchandise is unreasonable. Moreover, Commerce's Final Scope Determination in light of these sources before it on the administrative record is not supported by substantial evidence and is contrary to law.

### D. Commerce Cannot Play a Game of "Gotcha"

Defendant mischaracterizes AA Metals' position by stating that "{b}ut just because Commerce did not agree with AA Metals's {sic} characterization of the aluminum sheet exported from China to Turkey does not mean that the record was deficient." Def. Br. at 19; *see*

*also* Def. Br. at 12-14, 19-20.  The issue is not simply a choice "between two fairly conflicting views" and a difference in characterization between the AA Metals and Commerce as the Defendant submits.  Def. Br. at 14.  AA Metals, based on the representations of Commerce, had no knowledge that Commerce questioned the actual product characteristics – not just, as AA Metals was informed, whether the product as described by AA Metals and CBP was subject merchandise.  Throughout the pendency of this scope proceeding, Commerce referred to the Scenario 2 product as "continuous cast coil."  Commerce's actions in this proceeding are particularly troublesome when one considers that this is a Covered Merchandise Referral, meaning that CBP has a record before it and CBP is unable to determine whether this clearly defined product is subject to the *China CAAS Orders* for purposes of making an evasion determination. *See generally* Covered Merchandise Referral.  P.R. 4.

On the basis of this Covered Merchandise Referral, Commerce issued the following questions to AA Metals:

> 1. Provide the technical characteristics and specifications of the Chinese-origin aluminum sheet shipped from China to Turkey.  2. Identify the Harmonized Tariff Schedule subheading under which the aluminum sheet enters Turkey.  3. Describe the processing operations conducted in Turkey with respect to the Chinese-origin aluminum sheet.  4. Provide the technical characteristics and specifications of the aluminum sheet shipped from Turkey and entered into the United States.  5. Identify the Harmonized Tariff Schedule of the United States subheading under which the aluminum sheet enters the United States.

*See* Letter from Brian C. Davis, Program Manager, AD/CVD Operations, Office VI, Enforcement and Compliance, to Sandler, Travis & Rosenberg, P.A., *Re: Covered Merchandise Referral Regarding EAPA Investigation No. 7469: Initial Questionnaire* (Sept. 13, 2021) ("Initial Questionnaire").  P.R. 14.  Commerce specifically noted that "if you do not have this information or are unable to provide it, please state so and explain the reason."  *Id*.

Commerce's Supplemental Questionnaire did not question the status of the product as continuous cast coil at the time of entry into Turkey.   Rather, Commerce's Supplemental Questionnaire specifically referred to Scenario 2 as "continuous cast coil" and asked multiple questions as to justify how the "continuous cast coil" is primary unwrought aluminum and therefore is non-subject merchandise.   Supplemental Questionnaire  at 3-4 ("{t}he continuous cast coil in Scenario 2 appears to meet the physical description of the scope of the orders . . ." and "the chemical composition of the continuous cast coil in Scenario 2. . .").  P.R. 38; C.R. 9. The Supplemental Questionnaire requested AA Metals to describe how the Scenario 2 merchandise "exported from Turkey to the United States . . . meet the physical description of the scope of the {*CAAS China Orders*}."  *Id*. at 3-4.  P.R. 38; C.R. 9.  In other words, Commerce was focused on the physical description of the Scenario 2 product after further manufacturing in Turkey and at the time of entry into the United States, questioning if the Scenario 2 product at entry into the United States would otherwise meet the scope language of the *China CAAS Orders* but for the further manufacturing in Turkey.

As no point in the scope proceeding did Commerce question the documentation of record at the time of entry into Turkey, the product descriptions of the product at the time of entry into Turkey certified by AA Metals, or the fact that Scenario 2 was deemed "continuous cast coil" throughout the pendency of the scope proceeding.  The questions set forth by Commerce in the Supplemental Questionnaire indicate that Commerce was solely focused on how the "continuous cast coil" of Scenario 2 was non-subject merchandise, *i.e.*, Commerce did not question the status of Scenario 2 at the time of entry into Turkey as a "continuous cast coil."   Supplemental Questionnaire at 3-4.  P.R. 38; C.R. 9.

AA Metals had no way of knowing that Commerce did not consider the Scenario 2 product, as described "continuous cast," a pivotal issue in this proceeding.  Referring to Scenario 2 as "continuous cast" throughout the scope proceeding but then issuing a determination focused on the "characterization" of the Scenario 2 product was unlawful.  Commerce cannot act under "gotcha" policies.  *See e.g.*, *Böwe–Passat v. United States*, 17 CIT 335 (1993) (holding that Commerce's refusal to address previously unknown deficiencies was a "'gotcha' policy"); *AK Steel Corporation v. United States,* 22 CIT 1070, 34 F.Supp.2d 756 (1998) (sustaining Commerce's use of respondent's explanation of data discrepancy as record evidence because respondent "first became aware that reconciliation was in dispute upon receiving a copy of {d}omestic {p}roducers' {c}ase {b}rief" after the record closed).

Finally, Defendant's analysis is fatally flawed as Commerce's determination regarding the "characterization" of Scenario 2 product is not based on substantial evidence.  Def. Br. at 12-14.  The administrative record demonstrates that the International Trade Commission defined continuous cast coils with a thickness of 3-20 mm as primary unwrought aluminum with the HTS subheading 7601.20.30.00.  *See* Letter from Sandler, Travis & Rosenberg, P.A. to Dep't of Commerce, *Re: Common Alloy Aluminum Sheet from the People's Republic of China: Response to Initial Questionnaire* (Sept. 27, 2021) ("Initial Questionnaire Response") at 7, Exhibit 11. P.R. 20, 25; C.R. 1, 6.

Accordingly, Commerce's determination that the product subject to Scenario 2 is not continuous cast coil defined as unwrought aluminum is unreasonable and not in accordance with law.

### E.  Commerce Should Have Conducted a Substantial Transformation Analysis

Defendant's and Defendant-Intervenor's claims that Commerce was correct in failing to conduct a substantial transformation test when evaluating the merchandise under consideration

contradicts the plain language of the *China CAAS Orders* and the underlying administrative record.  Def. Br. at 20-24; Def.-Int. Br. at 6.  The *China CAAS Orders* define subject merchandise as:

> The merchandise covered by these Orders is aluminum common alloy sheet (common alloy sheet), which is a flat-rolled aluminum product having a thickness of .3 mm or less, but greater than 0.2 mm in coils or cut-to-length, regardless of width.  Common alloy sheet within the scope of the Orders includes both not clad aluminum sheet, as well as multi-alloy, clad aluminum sheet.  With respect to not clad aluminum sheet, common alloy sheet is manufactured from a 1XXX-, 3XXX, or 5XXX series alloy as designated by the Aluminum Association.  With respect to multi-alloy, clad aluminum sheet, common alloy sheet is produced from a 3XXX-series core, to which cladding layers are applied to either one or both sides of the core.

*China CAAS Orders,* 84 Fed. Reg. at 2,158-2,159, 2815.

Defendant points to language in the *China CAAS Orders* addressing processing in third countries as support for its erroneous claims.  This portion of the *China CAAS Orders* states:

> Subject merchandise includes common alloy sheet that has been further processed in a third country, including but not limited to annealing, tempering, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the Orders if performed in the country of manufacture of the common alloy sheet.

*Id.*

First, Defendant's reliance on this portion of the *China CAAS Orders* is misplaced, as the merchandise under consideration was not subject CAAS when exported from China into Turkey but rather an intermediary material input.  It was only after the merchandise was manufactured and processed in Turkey that the merchandise met the physical description of subject CAAS.  Thus, Defendant's argument fails.

Defendant's assertion that the product under consideration was subject merchandise at the time of import into Turkey is not supported by the administrative record which defines the product as continuous cast coil with a thickness of 3-20 mm which is considered primary unwrought aluminum. *See* Initial Questionnaire Response at 7, Exhibit 11.  P.R. 20, 25; C.R. 1, 6.  Commerce itself refers to the product as "continuous cast coil" in the supplemental questionnaire issued in the underlying proceeding.  Supplemental Questionnaire at 3-4.  P.R. 38; C.R. 9.  The record further demonstrates that the product was [  ] temper at the time of entry to Turkey.  Initial Questionnaire Response at 3, Exhibit 6 (documentation related to the technical specifications of the product at the time of import into Turkey).  P.R. 20, 22; C.R. 1, 3  As detailed extensively above, continuous cast coil and/or [  ] temper product is not subject merchandise.  Because the merchandise was not subject merchandise at the time of entry into Turkey, Commerce was required to conduct a country-of-origin test to determine whether the Turkish originating CAAS was in-scope merchandise.  Failure to conduct a substantial transformation analysis where the record evidence demonstrates that merchandise fell outside the scope of the order at the time it was entered into Turkey renders Commerce's decision unsupported by substantial evidence and contrary to law as Commerce's findings unlawfully expand the scope of the *China CAAS Orders* to include Turkish originating product.

Even if *in arguendo* Commerce properly determined that the merchandise was Chinese originating subject CAAS, a substantial transformation test should have been performed as the merchandise that entered into Turkey was substantially transformed into a new and distinct product.  The product that entered Turkey did not remain the same as the product that underwent processing that imparted mechanical properties to change the temper from [  ] temper to [  ] temper.  *See* Initial Questionnaire Response at 3, Exhibit 6 (documentation related to the

15

technical specifications of the product at the time of import into Turkey).  P.R. 20, 22; C.R. 1, 3; *see also id*. at 9-10, Exhibit 8 (documentations related to product at time of entry into the United States).  P.R. 20, 23; C.R. 1,4.  Moreover, the record demonstrates that the product underwent a [   ] percent thickness reduction due to the processing performed in Turkey.    Initial Questionnaire Response at 7.  P.R. 20; C.R. 1.

Particularly troubling is that Defendant recognizes the importance of the substantial transformation test in determining scope issues, noting that "Commerce typically determines country of origin based on the country where the merchandise is processed or manufactured . . . But, in circumstances in which the merchandise undergoes partial processing or manufacturing in multiple countries, Commerce relies on the substantial transformation test."  Def. Brief at 21 (*citing Canadian Solar Inc. v. United States*, 918 F.3d 909, 913 (Fed. Cir 2019)).  Defendant tries to distinguish cases cited in AA Metals' case brief, noting that the products under consideration that were processed in a third country were not subject merchandise.  Yet, for reasons discussed herein this is not the case.

Defendant also ignores Commerce's precedent finding that rolling substantially transforms a product.  *See e.g., Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Sheet and Strip in Coils from the United Kingdom*, 64 Fed. Reg. 30,699, 30,704 (Dep't Commerce June 8, 1999).  P.R. 44 at Ex. 8; C.R. 13 at Exhibit 8.; *see also Stainless Steel Sheet and Strip in Coils from Taiwan*, 71 Fed. Reg. 7519 (Dep't Commerce Feb. 13, 2006) and accompanying Issues and Decision Memorandum at Cmt 10, n 27. P.R. 44 at Exhibit 9; C.R. 13 at Exhibit 9.  Consistent with the findings in previous proceedings, in this case "cast coils are an unwrought primary aluminum with very brittle cast microstructure and must be further manufactured to become wrought aluminum before being used.  The manufacturing operations at

PMS change the unwrought aluminum coils to wrought aluminum coils after a [    ] percent thickness reduction."   Initial Questionnaire Response at 7.   P.R. 20; C.R. 1.   The rolling operations that result in this substantial transformation impart the mechanical properties required for the Aluminum Association designation which is required by the *China CAAS Orders*.

## III.   CONCLUSION

For the reasons set forth in this brief, AA Metals respectfully requests that this Court hold that Commerce's Final Scope Determination was not supported by substantial evidence and otherwise not in accordance with law. AA Metals respectfully requests this Court to remand this matter to Commerce with instructions to issue a new determination that is consistent with this Court's decision.

Respectfully Submitted,

By:    /s/ Kristen Smith
Kristen Smith
Sarah E. Yuskaitis

SANDLER TRAVIS & ROSENBERG, P.A.
1300 Pennsylvania Avenue, N.W.
Suite 400
Washington, DC 20004
Tel: (202) 730-4965
Fax: (202) 842-2247

*Counsel to AA Metals, Inc.*

Dated: December 1, 2022

## Certificate of Compliance

The undersigned hereby certifies that the foregoing brief contains 4,982 words, inclusive of footnotes, exclusive of the table of contents, table of authorities, and certificates of counsel, and counsel's signature block, and therefore complies with the maximum 7,000-word count limitation set forth in the Standard Chamber Procedures of the U.S. Court of International Trade.

By:     /s/ Sarah E. Yuskaitis
        Sarah E. Yuskaitis
        Sandler, Travis & Rosenberg, P.A.
        1300 Pennsylvania Ave., N.W.
        Suite 400
        Washington, DC 20004
        Tel: (202) 730-4967

        *Counsel to AA Metals, Inc.*

Dated: December 1, 2022